Modern Steel Structural Company, Appellant, v. Van Buren County, Iowa, Appellee, and Western Bridge Company, Intervener, Appellant.

**Counties:** CONSTRUCTION OF BRIDGES: FRAUD: EVIDENCE.  Where a
1   bridge contractor materially alters the plans and specifications for the construction of county bridges by reducing the amount of material therein, without the knowledge or consent of the county or its agents authorized to consent to the change, it amounts to a fraud for which the county may recover.

**Damages:** EVIDENCE.  It was not error for the court, in computing
2   damages sustained by a county by reason of the failure of a contractor to use the amount of material contracted for in the construction of bridges, to follow the figures given by an expert witness who was corroborated as to the amount of shortage, rather than the estimate of an officer of the company which furnished the material based upon the factory weights of which he had no personal knowledge, and who testified simply to the approximate correctness of his estimate.

**Breach of contract:** DAMAGES.  Where a contractor, in the con-
3   struction of county bridges, used material of less weight than provided in the contract, it was proper for the court in arriving at the measure of damages to add to the actual cost of the construction according to contract, the usual margin of profit to the contractor, as shown by the evidence.

**County bridges:** ESTOPPEL.  No act of an engineer appointed by
4   the county to supervise the construction of bridges, nor of an

individual member of the board of supervisors by which a con-
tractor was permitted to erect less valuable structures than pro-
vided by the contract, will estop the county from claiming
damages for the default as against the contractor or any one
claiming under him.

**Breach of contract:** ACCEPTANCE: ESTOPPEL. The acceptance of a
county bridge in ignorance of the fact that the same was not
constructed in accordance with the contract, will not estop the
county from insisting upon a breach of the contract or a re-
covery of damages.

**Same.** The execution and delivery to a bridge contractor of a
written acceptance of the work by individual members of the
board of supervisors, made at an informal gathering for the
purpose of examining the work to enable them to act intelli-
gibly upon the matter of accepting the same, was not an act of
the county; and it was not estopped thereby from relying on a
breach of the contract in the construction of the bridge.

**Same.** The public use of a bridge will not amount to an accept-
ance thereof and estop the county from insisting upon a breach
of the contract for its construction.

**Breach of contract:** ESTOPPEL. Partial payments by a county audi-
tor on a contract on the order of a single member of the board
of supervisors and without knowledge of the contractor's de-
fault in construction, will not estop the county from asserting
its claim for damages based on the contractor's breach of the
contract.

**Estoppel:** FRAUDULENT ACT OF AGENT. A county cannot be estopped
by the acts of its representative appointed to look after the
construction of bridges, who, through collusion with the con-
tractors, perpetrates a fraud on the county by the substitution
of materials inferior to that called for by the contract.

**Subcontractor's claims:** LIABILITY OF COUNTY. Where a county has
not reserved the right to pay the claim against a contractor
employed to construct bridges, and a subcontractor has failed
to file the statement of his demand as provided by Code, sec-
tion 3102, the county may rightfully pay the contractor accord-
ing to the terms of the contract, without inquiring as to ma-
terials furnished by subcontractors.

**Same.** A subcontractor who furnishes material for the construc-
tion of county bridges under an agreement with the principal
contractor alone, is charged with notice of the terms and con-
ditions of the principal contract, and his rights are limited
thereby; and where the county has lawfully discharged its
obligation to the contractor prior to notice of 'the subcon-

tractor's claim, or where the contract is void for fraud, the subcontractor has no recourse against the county.

**Subcontractor's claims:** DAMAGES: SET-OFF. Where a county contracted separately for the construction of two bridges and was sued by a subcontractor who furnished material for both under a single agreement with the contractor and who made but a single statement for the materials furnished and was seeking to force his entire claim against the county for an alleged unpaid balance for either or both bridges, the county could offset its entire damages for a breach of both contracts in determining whether there was anything in its hands applicable to the subcontractor's demand.

**Interrogatories:** FAILURE TO ANSWER: JUDGMENT. Code, section 3610, does not contemplate a summary entry of judgment because of indefinite or unsatisfactory answers by a municipal corporation to interrogatories attached to a pleading; and such an order will not generally be entered without an opportunity to the delinquent party to correct the fault.

*Appeal from Van Buren District Court.*— HON. ROBERT SLOANE, Judge.

MONDAY, FEBRUARY 13, 1905.

THE opinion states the case.— *Affirmed.*

*Wherry & Walker* and *Ryan, Merton & Newberry,* for appellant Modern Steel Structural Co.

*Mitchell, Sloan & McBeth* and *Pennington & Pennington,* for appellant intervener.

*J. C. Davis, E. R. Harlan,* and *E. L. McCoid,* for appellee.

WEAVER, J.— On June 20, 1900, the defendant county entered into two separate written contracts with the Western Bridge Company, by the terms of which the latter agreed to furnish the materials and erect for the former two bridges across the Des Moines river, as follows: One at the town of Selma for $12,050, and one at the town of Kilbourne for

$15,200. In each case it was provided that seventy-five per cent. of the cost of the materials should be paid for on their delivery and acceptance, and the remainder upon the completion and acceptance of the work. The Western Bridge Company, which was not a manufacturer of or dealer in bridge materials, entered into a contract with plaintiff for the purchase of such materials as were necessary, such materials to be prepared by the plaintiff ready to go into the bridges according to the plans or directions furnished by the bridge company. This contract was entire, covering the materials for both bridges, and providing for payment at a given rate per hundred pounds, seventy-five per cent. on receipt of materials at their destination and the remainder within thirty days of receipt of last shipment. Under this contract materials were furnished to the bridge company, and two bridges were erected in alleged compliance with the contract. This action was begun by the plaintiff against the county on June 20, 1901, under Code, section 3102.

The petition alleges the letting of the bridge contracts by the county to the bridge company, and the contract of the latter with the plaintiff, pursuant to which it furnished materials to the bridge company, on which there was an unpaid remainder of $6,099, with interest. It is further alleged that within thirty days after the last of said materials was furnished plaintiff filed a duly verified statement of its account with the auditor of said county, which account and claim is still unpaid, and that under the terms of the contract between the bridge company and county the latter was required to withhold all of the contract price except seventy-five per cent. of the cost of the materials for the purpose of meeting such claims as the one now made by the plaintiff. Plaintiff therefore asks to recover from the county the full unpaid balance of its account against the bridge company. For answer to this claim the county admits letting the bridge contract to the Western Bridge Company, but denies that said bridges ever were erected according to

said agreements. It alleges that the bridge company fraudulently substituted and placed in each of said bridges other lighter and less valuable materials than were called for by said contracts; that by reason of said fraud and failure to perform said contracts the defendant has sustained damage greatly in excess of the unpaid remainder of the contract price, and there is nothing in the hands of the defendant applicable to the payment of the plaintiff's claim. In reply the plaintiff alleges that the county was represented by one Booth, an engineer, in supervising the construction of the bridge; that Booth inspected and approved the materials as delivered; and that since the bridges were built the county, with full knowledge of all the facts, has accepted and opened said bridges to public use, and is now estopped to deny its liability to pay therefor.

On December 11, 1901, the Western Bridge Company intervened, setting up its contracts with the county to build the bridges and with plaintiff to furnish the materials therefor, and alleges that such materials were substantially of the character and weight called for by the contracts with the county. It also pleads the inspection and approval of the materials and of the bridges by the agents and representatives of the county, and asks judgment for the unpaid balance of the contract price. As against the plaintiff it sets up various claims for damages on account of delays and expenses occasioned by the fault of plaintiff in the completion of the work. Taking issue upon the petition of intervention, the plaintiff denies the bridge company's claims for damages, and demands judgment against it for the unpaid balance of the account for bridge materials. The county answering said petition, sets up in detail the aforesaid charge of fraud in the construction of the bridges and in the failure of the intervener to perform its contract, and denies the authority of Booth or any other person to consent to any material departure from the agreement.

The issues were tried to the court as in equity. The

decree finds the Western Bridge Company failed to perform its contract, and that the county was entitled to damages from said company in the sum of $1,046.42 in excess of the unpaid remainder of the contract price for the construction of the bridges, and rendered judgment accordingly. It also finds the plaintiff entitled to recover from the bridge company the sum of $6,815.67, being the unpaid remainder of the account for materials furnished; and as against the county the petition was dismissed. The plaintiff and the intervener have both appealed, but the appeal on the part of the intervener has not been argued.

I. Turning first to the fact questions involved, we find ourselves in accord with the conclusions of the trial court as expressed in its written opinion which accompanies the decree. Without attempting to set out in full the various circumstances disclosed by the voluminous record, we may say it is shown beyond a reasonable doubt that the bridge contractor willfully and designedly ignored the specifications upon which it bid for and obtained the contracts from the county, and prepared other specifications for materials of greatly inferior weight and strength. It was upon these substituted specifications, made without the authority or consent of the county, that the contract between the plaintiff and the bridge company was entered into, and pursuant to which plaintiff furnished the materials. By this scheme the Selina bridge, which should have contained 230,000 pounds in the superstructure and 108,000 pounds in the substructure, was reduced to 183,560 pounds in the first item and 69,630 pounds in the last item. In respect to the Kilbourne bridge the shortage was a little less flagrant, but even there it amounted to 18,180 pounds in the superstructure and 31,002 pounds in the substructure; making the total weight of metal in the bridges as constructed 133,992 pounds less than it should have been had the company's contract been faithfully and honestly performed.

*1. CONSTRUCTION OF BRIDGES: fraud; evidence.*

It would be farcical to hold that this was in any sense of the word a substantial compliance with the contracts, or to account for the discrepancy on the theory of mere accident or mistake.    Indeed, it is scarcely denied by the bridge company that the specifications on which the contracts were let were by it systematically scaled down in size and weight of materials, but it is sought to excuse or justify this action on the claim that the board of supervisors or the engineer employed by the board to look after the interests of the county consented to the change.    The proof entirely fails to establish any consent or agreement by the board of supervisors for this radical variation from the terms of the contract, and it is very certain that the engineer had no power or authority to bind the county to any such change.    It is equally clear that the engineer did know that the bridges were not being built according to the agreement, and his acquiescence therein can be accounted for on no other theory than corrupt connivance in the wrong being perpetrated. There is room also to believe that the individual member of the board in whose district or territory the bridges were located knew, while the bridges were still in the course of construction, that they did not come up to contract requirements, but his lack of technical knowledge of such work may account for his apparent disregard of the public interests committed to his care.    Indeed, plaintiff's counsel frankly accepts the alternative, saying that if no change was made in the contract by the consent of the board of supervisors, or of the duly authorized engineer, " then it cannot be denied that the engineer was in collusion with the Western Bridge Company to defraud this county; neither can it be denied that the board of supervisors were shamefully remiss in their duties in permitting this material to go into the construction of the bridges."    This statement must be concurred in by every candid reader of the record here presented, and, the alleged change or modification in the contract not having been shown, and the failure of the bridge company to con-

struct the bridges according to agreement having been fully established, we have next to inquire concerning the rights and remedies of the several, parties under the issues made by their pleadings.

II.   Objection is made to the method adopted by the trial court for the computation of damages which the county is entitled to recover from the Western Bridge Company.

2. DAMAGES: evidence.

It is said that the court adopted as its estimate of the deficiency in the weight of the bridges the figures given by a single expert witness — one Ditman — and ignored the estimates given by other witnesses.   It is true that the computations made by the trial court correspond closely, if not entirely, with those made by Ditman; but an examination of the record shows that the opinion of this witness was corroborated in many ways, and we think it may safely be accepted as a conservative and fair estimate.   The president of the steel company, Mr. Harding, states the weights of the material to have been somewhat greater than Ditman's estimate, and it is urged that, as he testifies to actual weights, as opposed to an expert's opinion, his figures should control.   It is not quite correct to say that Mr. Harding testifies to actual weights. Attached to plaintiff's petition is a bill of items which purports to give the net weight of each shipment, and this he says is correct, or substantially so.   He elsewhere says: " In making my estimates of the cost of those bridges, I took our scale of weights for the amount of metal in the bridges.   The estimate I gave you may not foot up to the total amount exact, but it will be approximately correct." He nowhere says that he personally weighed or supervised the weighing of the metal, or that he gives such weights from actual personal knowledge.

On the theory that the bridges, as constructed, were of such character and strength as to be available for public use, though not made according to contract, the trial court adopted as the measure of the county's damages the value of

the metal which represents the difference between the weight
of the bridges if constructed according to con-
tract and their weight as actually constructed.
On this basis the court states its finding as
follows:

3. BREACH OF
CONTRACT:
damages.

The value of the difference in the steel of the Selma
bridge would be as follows:

Deficiency in superstructure, 46,440 lb., at 3.3
   cents ................................... $1,532 52
Deficiency in substructure, 38,370 lb., at 3 cents.   1,151 10

   Total ................................... $2,683 62
Add 15 per cent............................      402 50

   Total ................................... $3,096 16
In the Kilbourne bridge, the difference in the
   superstructure is 18,180 lb., worth 3.3 cents
   per pound, making ...................... $  599 94
Substructure, 31,002 lb., at 3................      930 06

   Total ................................... $1,530 00
Add 15 per cent. profit.....................      229 50

   Total ................................... $1,759 50

Against the aggregate of these damages, $4,855.66, the
court set off the unpaid remainder of the contract price of
the bridges, $3,905.60, leaving a balance due the county
from the bridge company of $950.06, for which sum, with
interest, judgment was accordingly entered.   In explanation
of the court's estimate above quoted it should be said the
testimony tends to show that in the construction of bridges a
fair margin of profit to the contractor is at least fifteen per
cent. upon the cost of materials in place in the complete
structure.   It is the contention of the appellant that this

allowance of the margin of profit is erroneous, and should have been deducted from, instead of added to, the value of the material required to make the bridge according to contract. We do not understand on what theory it is claimed that fifteen per cent. should have been deducted from the cost of the metal in the completed bridge, for such cost includes only purchase price, with freight and expense of construction added, without any margin to the contractor. Such being the case, it would seem a fair proposition that in estimating the value of a bridge of the full weight contracted for there should be added to the bare cost of construction such reasonable margin of profit as the county would ordinarily be required to pay in letting a contract for such work.

III. Appellant argues that, even conceding the failure of the bridge company to construct the bridges according to contract, the county is estopped by the acts of the board of supervisors and Engineer Booth from any recovery of damages; or, if entitled to recover damages from the bridge company, it is estopped from setting up such damages as against the plaintiff's claim. We regard it as elementary that the county cannot be estopped by the fraudulent or unlawful acts of its officers or agents, and this is assuredly true where the fraud or wrong involves a betrayal of the very interest which they are elected or appointed to protect. *Gill v. Appanoose County,* 68 Iowa, 21; *McGillivray v. Township,* 96 Iowa, 633; *Bank v. Township,* 86 Iowa, 339. It follows that any act of the engineer or any individual member of the board of supervisors by which it was sought or intended to permit the bridge company to erect bridges materially inferior or less valuable than were contracted for, and yet draw from the county the full contract price, will not operate to create an estoppel against the county in favor of the delinquent contractor, or any other person claiming by, through or under him.

But it is also contended that, after the bridges were

4. COUNTY BRIDGES: estoppel.

completed, the board of supervisors accepted them as being
a sufficient compliance with the contracts, and the claim
for damages cannot now be insisted upon as a
defense against this claim presented by the
plaintiff.   The facts on which this claim of ac-
ceptance or ratification is grounded are as follows: On Janu-
ary 24, 1901, the three members of the defendant's board
of supervisors met at the Selma bridge and made a test of
the strength of the bridge with several wagon loads of sand.
Two of the members united in giving a writing to the bridge
company as follows: " We, the supervisors of Van Buren
county, having tested the Selma bridge and found it in ac-
cordance with contract, hereby accept the same as the prop-
erty of Van Buren county.   Will Hastings.    W. E. Bald-
win."   The third supervisor, being convinced, as he now
says, that the bridge was not in accordance with the con-
tract, and not wishing to assume any responsibility for its ac-
ceptance, went away, and took no part in the proceeding.
Some days later the supervisors met at the Kilbourne bridge,
to which a test of the kind above mentioned was applied, and
there seems to have been an expression of opinion by at least
two of the members that the bridge was satisfactory, but by
this time the deficiency in the weight of the metal had be-
come the subject of more or less public discussion, and it
was determined to postpone action upon the matter of ac-
ceptance of the work.   Both bridges were, however, thrown
open or left open to public use, and the supervisors provided
for the construction or completion of the approaches.   Un-
less these meetings of the supervisors to inspect the bridges
are to be construed as sessions of the board, and the giving
of the writing aforesaid as the act of the board, and not
of the individual members signing it, there was never a
formal acceptance of either bridge.   But an acceptance or
ratification induced or obtained by fraud or deceit, or given
in ignorance that the thing accepted is not in accordance with
the contract under which it is furnished, will not estop the

5. Breach of
contract:
acceptance;
estoppel.

acceptor from alleging the breach of contract, or from a recovery of damages therefor. *Carthan v. Lang,* 69 Iowa, Iowa, 384.

In our judgment, however, the signing and delivering of the paper to the bridge company by two of the supervisors cannot be said to have been the act of the board, nor bind-

6. SAME.

ing upon the county as an acceptance of the Selma bridge. The meeting seems to have been an informal gathering for the purpose of examining the work, and enabling them at the proper time to act intelligently upon the matters of its acceptance; but, so far as appears, the meeting was not called to order, or organized for official business, no resolution was offered or voted upon, no clerk was present to preserve a record of the proceedings; nor was this informal action, so far as appears from the record, ever reported to or approved by the board in session. That the act of the individual members of a public body, even though concurred in by a majority of its members, is not official or binding upon the municipality which they represent, is too well settled for doubt or debate. *Young v. Black Hawk County,* 66 Iowa, 465; *Rice v. Plymouth County,* 43 Iowa, 136; *Ind. Dist. v. Wirtner,* 85 Iowa, 387.

It may be admitted that an acceptance can be found or inferred from the conduct of the parties, and there may also be circumstances under which the party receiving and

7. SAME.

enjoying the benefit of a contract will be estopped to deny acceptance, but we find nothing of that nature in the case before us. The bridges are of a ponderous and presumably permanent character. Like a courthouse, or business block, or dwelling, they cannot be discarded nor readily removed. They are attached to the soil, are a part of the public highway, and their use by the public is not a waiver of the right to insist upon the breach of the contract. *Carthan v. Lang, supra; Mallory v. Montgomery County,* 48 Iowa, 681.

Nor do the payments which have been made to the bridge company estop the county to assert its claim of damages. This must be so for two sufficient reasons. In the first place, the payments are not shown to have been made with knowledge of the default of the bridge company. Two of the. three supervisors constituting the board in 1901, together with the former member who retired December 31, 1900, unite in testifying explicitly that they. never knew of or consented to any change in the terms of the contract, and did· not know of ·this change in the character and weight of the materials until after the time of this alleged acceptance. It is also shown without dispute that the payments to the bridge company were made without any presentation to or allowance of the claim by the board, and without any order of the board for the issuance of the proper warrants. In the loose and unbusinesslike methods which seem to have prevailed in the conduct of the county's affairs, there appears to have been some sort of general understanding between the members of the board that whenever claims or demands were presented on account of work done or expense ·incurred, bearing the indorsement or approval of the individual member in whose part of the county the transaction in question occurred, the auditor should issue a warrant for its payment. The list of claims thus paid in vacation upon the approval of a single individual member would be taken up at the next session of the board, and a perfunctory order of " allowance " entered of record. It was in this manner that the payments to the bridge company were made — acts so clearly in violation of law that no rights can be predicated thereon by way of an estoppel against the county. We do ·not wish to be understood as asserting that the supervisors or auditor acted corruptly in respect to these payments, but the practice of which this is an illustration is so essentially bad that no amount of good faith or upright intention can justify. or excuse it. The board is elected to act as a body —

8. BREACH OF CONTRACT: estoppel.

a unit — and not as irresponsible individuals; and the county is entitled to have the candid investigation and united action of the entire board, or at least of a quorum of its members, upon every dollar of expenditure upon which it is called to pass.

We find nothing upon which the estoppel asserted by the plaintiff can be upheld. Conceding the knowledge and consent of Booth to the substitution of the lighter material,

9. ESTOPPEL: fraudulent act of agent.

it was clearly a fraud upon the county, and of itself is of no force or effect to deprive the county of its right to insist upon a full and substantial performance by the bridge company. If this fraud was not known to the board of supervisors, then of a certainty neither the contractor who inspired the betrayal of trust, nor the plaintiff who claims through that contractor can thereby deprive the county of its right to the benefit of its contract. On the other hand, if the supervisors knew or consented to the substitution of bridges having a deficiency of more than sixty-five tons of metal to be paid for at full contract price, then they too became parties to the fraud, and the county is not bound thereby to the contractor or to the plaintiff, whose rights, generally speaking, are to be measured by those of the party to whom it furnished the materials. It is said by counsel that if the supervisors lacked the skill or experience to enable them to pass intelligently upon the work or materials in the bridges it was their duty to appoint some competent person for that purpose, and that his acts in the premises will bind the county. For the purpose of this case the proposition stated may be accepted as correct, with this vital qualification: that the county can in no event be bound or estopped by the collusion of the person thus appointed with the contractor to perpetrate a fraud upon the county which he represents.

IV. It is not to be overlooked that plaintiff has no contractual relations with the defendant county. It sold the bridge materials, not to the county, but to the Western

Bridge Company.   It has no right to recover from the coun-

10. Subcontractor's claims: liability of county.

ty, except as it may succeed in establishing a claim under the provisions of the statute.   The county did not, by its contracts with the bridge company, reserve the right to discharge the claims of subcontractors.   The statute (Code, section 3102)· is intended to provide for one who furnishes labor or materials to a contractor upon a public work a remedy having some analogy to a mechanic's lien.   But it does not create any lien.   It provides that by taking the proper steps within due time, the claimant may, in effect, be substituted for the contractor, and recover from the municipal corporation to the extent of his just demand, if there be found in the hands of the corporation any moneys due to such contractor.   The law is carefully framed to protect the municipality from onerous burdens and undue annoyance in litigation of this kind, and specifically provides that the claim of a subcontractor shall not be enforced against a municipal corporation "in excess of the contract price to be paid for such building, bridge, or improvement, nor shall such corporation be required to pay any such claim before, or in any different manner from, that provided in the principal contract."   No statement of the plaintiff's claim in this case was filed with the county auditor, and no notice thereof served upon the county, until February 6, 1901, since which no payments of any kind have been made to the bridge company.   When the plaintiff's statement was filed and notice served, the bridge company had already been paid all and more than it was entitled to receive for the bridges constructed.   This being found, we are brought to the question whether the county has in any respect so violated its statutory obligations to the bridge company's subcontractors that, although it owes such company nothing, it should still be compelled to pay the plaintiff's claim.   Not having reserved the right to pay the claims of such contractors, and no statement being filed or notice served as provided by statute, the county could rightfully

pay the contractor according to the terms of the contract, without any inquiry whether he had paid plaintiff for the materials used in the bridges. This we have frequently held. *Epeneter v. Montgomery County,* 98 Iowa, 159, and cases there cited.

The subcontractor who intends to assert a claim under this statute must take notice of the terms and conditions of the principal contract, for it is through this contract his

11. SAME.      rights, if any, are to be traced. Now, the contracts with the county provided that the bridges should be construted of materials of a given kind, size, and weight. The contractor wrongfully substituted materials of substantially less size, weight, and value. The materials thus made use of to defraud the county were furnished to the contractor by the plaintiff. It may be conceded that the plaintiff was not a party to the conspiracy for the perpetration of this fraud, but it saw fit to sell the materials to the bridge company, and unless those materials were something called for by the terms of the principal contract, and therefore something for which the county must have understood its contractor might become indebted to others, the sale must be held to have been made on the credit of the bridge company alone, and no right can be asserted thereunder against the county. There is no hardship in saying to the subcontractor that, if he is not content to sell his materials upon the credit of the principal contractor, and wishes to secure the benefit of the statute, he must look to it that the materials are such as fairly contemplated by the terms of the principal contract. For illustration, where a city lets a contract for paving its streets with vitrified brick of a given standard or quality, a subcontractor may furnish such brick, and, by taking the proper and timely steps, may establish his claim against the municipality; but if the principal contractor fraudulently substitutes soft, inferior, and distinctly less valuable brick, such as upon no reasonable or fair interpretation can be said to come within the con-

templation of the contract, a very different question is presented. To say that under such circumstances the subcontractor, who furnished the inferior materials with which the fraud was accomplished, though without any wrongful purpose on his part, may establish a claim against the city, and thus compel the city to pay the full contract price, where the principal contractor himself could recover nothing, would be a most inequitable proposition, and we cannot hold that the Legislature intended to create such an anomalous and oppressive right of action. Such an interpretation of the statute would make every municipal corporation the helpless victim of fraudulent combination in the letting of every contract for public improvements.

By reason of its fraud and failure to perform, the bridge company could maintain no action and recover no compensation on the contracts made with the county. The utmost limit of its right to recover in any form of action would be the contract price, reduced by the damages which the breach of its contract had occasioned to the county. If, on account of the fraud or failure of the bridge company, the contract is without legal vitality in the company's hands, it cannot be imbued with life for the benefit of the subcontractor. The stream cannot rise higher than its source. The payments made to the bridge company may have been improvident in the failure of the supervisors to withhold a sufficient margin to cover all possible damages to the county, but they were not made in wrong of the plaintiff. If we should adopt plaintiff's theory that the Selma bridge was completed and accepted on January 24, 1901, then, if the contract is to be considered, the entire consideration for that bridge became at once due and payable, and plaintiff, having filed no statement of its claim, cannot complain that such payment was in fact made. Treating the price of the Selma bridge as having been fully paid, there remained payments for which the county was entitled to credit upon the Kilbourne bridge, amounting to $11,294.46. This sum in-

cludes an item of $979, being the remainder of a larger sum which it is conceded was improperly obtained from the county by the bridge company, without authority from the board of supervisors, and was in part refunded. The payments made and applicable to this bridge amount to substantially seventy-five per cent. of the contract price, and this, it will be remembered, is the limit of the payment which the bridge company could demand until the completion of the work. This limit had been reached before plaintiff's statement of account was filed.                    •

It seems, therefore, that· from the standpoint of either party to the controversy, the final inquiry is whether the county can be required to forego its claim for damages, and pay this money over to the plaintiff. For the reasons already stated, this cannot be done. The principal, if not the only, reason for withholding any part of the price for the completion of the work was to protect the county against .the consequences of the contractor's wrong or default, and that protection should not be destroyed for the benefit of a third party, unless it be for some failure of duty which the county owed to such party — a circumstance which is not shown to exist. The suggestion of counsel that, in any event, the right to set off damage applies to such only as were occasioned by failure to properly construct the Kilbourne bridge, and that claims for damage on account of the Selma bridge must be prosecuted by independent proceedings against the bridge company. It has been the appellant's contention at all times that, while the undertaking to build the bridges was contained in separate contracts, they were in fact a single transaction, and must be so treated. There was but a single contract between the plaintiff and the bridge company. But a single statement of account, comprising all the materials for both bridges, was filed with the auditor. Plaintiff is here seeking to enforce its claim under that statement for the price of all the materials for both bridges, as against the alleged

*12. Subcontractor's claims: damages; set-off.*

unpaid balance of the contract price for either or both; and we can conceive no good reason why the county may not insist upon its entire damages being considered in determining whether there be anything in its hands applicable to the plaintiff's demand.

V. Plaintiff attached certain interrogatories to its reply, to be answered by the county. On the claim that some of the questions had not been fully and explicitly answered, plaintiff moved to strike the responses thereto, and for judgment, because of such failure, as provided in Code, section 3610. The overruling of this motion is assigned as error. The ruling was correct. The statute does not, in our opinion, contemplate the summary entering of judgment because of an indefinite or unsatisfactory answer to such interrogatories, and such order could not, in general, be properly made without giving the delinquent party an opportunity to correct the fault complained of. Moreover, the party called upon to answer in this case was a municipal corporation. It could not be made a witness, and, if it was subject to an order for compulsory answers to interrogatories attached to a pleading, it could answer only by its officers or agents. These persons may or may not be able to respond from personal knowledge, and, if their answers are in some respects indefinite or incomplete, it does not follow that the persons making them are perverse or uncandid, or that the municipality should, upon that account, be deprived of a hearing upon the merits of its case.

What we have already said makes it unnecessary to discuss other questions argued by counsel. The decree of the district court appears to effect justice between the parties as nearly as such result is possible under the complication of circumstances, and it is *affirmed.*