## Van Buren County, Appellee, v. American Surety Company, Appellant.

**Principal and surety:** SURETY COMPANIES: NATURE OF BUSINESS.
1 The business of corporations organized to assure the performance of contracts for profit partakes largely of the nature of insurance, and the rules governing insurance cases are generally applicable thereto.

**Same:** DEFAULT: NOTICE. The condition in a surety company's bond
2 requiring notice of the principal's default is one to be performed subsequent to loss or damage by reason of the default, and although a condition precedent to the right to maintain the action, it pertains to the remedy and is not essential to the binding force of the contract, and therefore is not to be so strictly construed as a condition involving the essence of the agreement.

**Surety contracts:** DEFAULT OF PRINCIPAL: FRAUD: NOTICE. A surety
3 contract, which undertakes to identify a county for the faithful performance of a bridge company's agreement to construct a bridge of certain weight, includes a default chargeable to deceit and fraud; as in the secret substitution of a lighter construction than that contracted for; and notice thereof is not due the surety, under the terms of its contract requiring notice of a default within a specified time, until the fraud is discovered or in the exercise of reasonable diligence should have been discovered.

**Same:** PAYMENTS TO PRINCIPAL: RESERVE: LIABILITY OF SURETY: ES-
4 TOPPEL. Conceding as a general rule that when the obligee in a surety contract fails to retain the reserve fund until completion of the contract, as provided therein, the surety is discharged, yet, where excessive payments are induced by the secret fraud of the principal the surety cannot rely thereon to defeat its liability for the principal's default; nor is the county estopped to assert the default because its engineer approved of the scheme resulting in excessive payments, with knowledge and participation in the fraud.

**Same:** MODIFICATION OF CONTRACT: NOTICE. Where a bridge builder
5 in violation of his contract and without the knowledge of the county substitutes a lighter material than that agreed upon, the contractor's surety cannot insist upon its discharge from liability for his wrong, on the ground of a material change in

the contract without its consent; and the county is not charged with notice of the change pending completion of the work because of the knowledge of its engineer, corruptly induced by the builder to acquiesce in the scheme for defrauding the county.

Guaranty: LIABILITY OF GUARANTOR.  A contract of guaranty which is absolute fixes the liability of the guarantor as completely as that of a surety; and if conditional, failure to give notice of the principal's default will not discharge the guarantor, in an absence of a showing of prejudice resulting from the laches.

*Appeal from Van Buren District Court.*— HON. ROBERT SLOAN, Judge.

WEDNESDAY, FEBRUARY 19, 1908.

ACTION at law to recover upon bonds securing the performance of contracts for the construction of certain bridges. Trial to the court without a jury.   Judgment for plaintiff, and the defendant appeals.— *Affirmed.*

*H. F., F. A. & H. F. Pennington, Mitchell & Hunter,* and *R. R. McBeth,* for appellant.

*E. L. McCoid, County Attorney,* and *W. M. Walker,* for appellee.

WEAVER, J.— On June 20, 1900, the American Bridge Company entered into written contracts with Van Buren county to erect two steel bridges known in the record as the " Selma Bridge " and the " Kilburn Bridge."   The agreed price of the Selma Bridge was $11,950 and of the Kilburn Bridge was $14,950, the former to be completed on November 19, 1900, and the latter on December 1, 1900.   In other respects the two contracts are substantially identical in their terms and conditions, to which, so far as material to the present controversy, more specific mention will be hereinafter made.   To secure the faithful performance of these contracts, the bridge company executed and delivered to the

county its two several bonds with the appellant herein as security. On March 30, 1901, the county brought an action at law upon said bonds to recover damages for the alleged failure of the contractor to construct the bridges according to the terms of the agreement. While the petition originally specified various particulars, in respect to which it was alleged that the bridges had not been constructed according to contract, all seem to have been eliminated, except the claim that the bridge company fraudulently substituted lighter and less valuable materials in the construction of each of said bridges than were called for by the contract, with the result that the amount of metal in the completed structures is less by many tons than it would have been had the contracts been fairly and honestly performed. A jury being waived, the cause was tried to the court, which found the charge of fraud as above indicated in the substitution of lighter and inferior materials in said bridges had been established by the evidence, and that the county had been damaged thereby in the sum of $4,845.24. It appearing, however, that the county still had in its hands an unpaid balance of the contract price of the bridges to the amount of $3,905.67, the court applied this sum in reduction of the proved damages, and entered judgment in plaintiff's favor for the difference $939.67.

I. The bonds in suit attach certain conditions to the liability of the surety company, among which are the following: " First. That, in the event of any default on the part of the principal in the performance of any of the terms or conditions of said contract, written notice thereof, with a verified statement of the facts showing such default and the date thereof, shall, within ten days after such default, be mailed to said surety at its office in the city of Chicago, No. 704 Marquette Building. Second. That no suit, action, or proceeding shall be brought or maintained against the principal or surety upon or by reason of any such default, after the expiration of four months after such default, nor,

in any event, after the 1st day of April, 1901." This action was begun March 30, 1901.

It is the claim of appellant that plaintiff failed to give notice of the contractor's default within the time thus fixed, and therefore this action cannot be maintained. It is also claimed that, so far as the plaintiff's demand has reference to the construction of the Selma Bridge, the action was not begun within four months after the alleged default, and is therefore barred by the contract limitation. That the surety in a bond may prescribe reasonable conditions for notice of the principal's default, and for the release and discharge of such bond upon failure to comply therewith, may be admitted for the purposes of this case; but the question what shall be deemed due notice within the true meaning and intent of the contract is another consideration, which requires more particular examination of the proved or conceded facts. The trial court has found that the Selma Bridge was not completed until some time in January, 1901, when a majority of the board of supervisors, acting individually, only, undertook to accept it, and caused the county auditor to issue warrants to the bridge company for the remainder of the agreed price of that structure, but such acts were done by the supervisors without any knowledge or notice of the fraud which had been practiced by the contractor. The other bridge was not completed or tendered to the county until after March 1, 1901. Prior to that date, and immediately prior to February 14, 1901, the wrongful substitution of the lighter and less valuable materials in the construction of the bridges was discovered by the county, and thereupon and within less than ten days it caused written notice of the fact to be given to the surety company. Unless the action of the supervisors above mentioned with respect to the Selma Bridge is to be construed as an acceptance, neither structure has ever been formally accepted, though both have ever since been in use as part of the public highway.

The contention of the appellant that the aforesaid writ-

ten notice of the contractor's fraud was not given within ten days after the default complained of is sought to be maintained on the following grounds: It is first said that, as the contract was by its terms to be completed on or before November 19, 1900, notice should have been given the surety of the failure so to do, and, such notice not having been given within ten days from said date, the surety was thereby discharged; or, in any event, that action as to the Selma Bridge is barred by the contract limitation of four months. We do not so construe the undertaking. It is true that the contract named November 19, 1900, as the date for the completion of the Selma Bridge, but it evidently contemplated the possibility, if not probability, that the work would be hindered or delayed, and that the actual completion might not be accomplished until a later date. To provide for such contingency, it was agreed that for any delay beyond the time fixed the contractor should be subject to a stated *per diem* penalty. To hold the surety for such penalties, it may be that notice of the failure to complete the bridge within the stipulated time should have been promptly given, but the appellee is making no claim in this court for any recovery on that ground, and the judgment appealed from includes no allowance of that nature. Nor would the four-months limitation begin to run as between the county and the contractor until the fraud on which recovery is claimed was discovered, and the surety in this respect occupies no stronger position than the principal.

It is further argued, if we understand counsel, that the default, if any of the contractor, occurred when the inferior materials were delivered on the ground or placed in the bridges, and that, to hold the surety liable, notice thereof should have been given within ten days thereafter.

Preliminary to a discussion of these propositions, it is to be said that, while the relation of appellant herein is spoken of as that of surety or guarantor, counsel upon both sides cite and rely upon precedents afforded by the decisions

of this and other courts in actions growing out of con-

1. PRINCIPAL AND SURETY: surety companies: nature of business.

tracts of life, accident, fire, and fidelity insurance. These authorities are fairly in point, for the business of corporations organized for purposes of profit in assuring the performance of contracts of various kinds partakes largely of the nature of insurance, and is carried on in much the same manner. *Lumber Co. v. Peterson,* 124 Iowa, 615; *American Surety Co. v. Pauly,* 170 U. S. 143, 144, (18 Sup. Ct. 552, 42 L. Ed. 977); *Shakman v. Credit Co.,* 92 Wis. 366 (66 N. W. 528, 32 L. R. A. 383, 53 Am. St. Rep. 920); *Fenton v. Fidelity Co.,* 36 Or. 283 (56 Pac. 1096, 48 L. R. A. 770); *People v. Rose,* 174 Ill., 310 (51 N. E. 246, 44 L. R. A. 124); 1 Joyce on Insurance, section 12.

Following an analogy afforded by the law of insurance, we first note that the condition requiring notice to the surety is one to be performed after the occurrence of the loss or

2. SAME: default: notice.

damage for which recovery is sought, and is not essential to the binding force of the contract while it is running prior to any default. Conditions of this class pertain to the remedy, and, though precedent to the maintenance of an action, are not ordinarily as strictly construed by the courts as are those conditions involving the essence of the agreement. *Building & Loan Ass'n v. Fidelity Co.,* 118 Iowa, 735; *W. H. Coffee Co. v. Insurance Co.,* 110 Iowa, 425; *Peele v. Provident Fund,* 147 Ind. 543 (44 N. E. 661, 46 N. E. 990).

The clear intent of the parties is not to be violated or ignored; but such intent is to be gathered from the language of the instrument fairly read in the light of all the cir-

3. SURETY CONTRACTS: default of principal: fraud: notice.

cumstances attending its making and the apparent purpose it was intended to serve. *Ellis v. Insurance Co.,* 64 Iowa, 508. A surety bond or contract of indemnity would be farcical if made subject to conditions which are impossible of performance, or conditions which deprive it of all real force and effect as

surety. By the bond in suit the surety company undertook to stand good for the faithful performance of the bridge company's contract. This obligation extends not alone to defaults which are chargeable to the contractor's incompetency or lack of financial ability, but also those which are chargeable to its duplicity and fraud. Fraud is the product of deceit and concealment, and to hold that a party who demands and receives a bond 'against injury therefrom is bound to discover the secret wrong as soon as it is committed, and give notice thereof at the risk of destroying his security, is so unreasonable that the court will not attach such construction to its terms, unless the clear meaning of the language imperatively requires it. Referring again to the bond, it will be seen that the same condition which requires the written notice requires that it shall be accompanied with a statement of the facts showing the default and the date thereof. Similar conditions are not infrequent in insurance policies, accident policies, fidelity bonds, and other contracts of indemnity, and the weight of authority supports the reasonable proposition that the notice thus required is not due within the meaning of the provision until the fact of which the insurer or surety is to be apprised is known to the other party, or until, in the exercise of reasonable diligence, he ought to have known it.

It has also often been held that, where circumstances render a condition affecting the remedy impossible of performance, it will not be allowed to defeat recovery on a meritorious claim. Such was our holding in *Eggleston v. Insurance Co.*, 65 Iowa, 316, where the production of invoices and bills of goods destroyed was made a condition of the defendant's liability upon its policy, and, upon a showing made that insured could not produce them, we said: " We think she was not required to do an impossible thing, and, if it can be shown that without any default or fraud on her part compliance is rendered impossible, she may recover without performing the condition." A like condi-

tion was similarly construed in *Bumstead v. Insurance Co.*, 12 N. Y. 81, where the court, speaking by Allen, J., says:

What shall be considered a performance so as to entitle a party to insist upon payment of a loss within the terms of the policy depends upon the true construction of the contract of the parties. A strict interpretation of the language employed would not unfrequently prevent a recovery against the company, as no exceptions are made to the requirements to furnish the inventory, and to produce the books and vouchers. The inventory required is one strictly accurate, not approximating to accuracy, and made according to the best knowledge the party may have. Such a statement, though made out with all care and honesty and really affording the insurers all the information they could reasonably desire, would not be an inventory of the property within the literal meaning of the condition. So the nonproduction of books and vouchers destroyed by the very fire against which the party had sought indemnity would effectually defeat his claim under the policy. Such an interpretation would be unreasonable, and cannot be supposed to have been in the minds of the contracting parties at the time the insurance was effected. The construction of these conditions should be reasonable and as near the apparent intent of the parties as may be consistent with the terms employed, taking into consideration the motive that led to their insertion in the contract, and the object intended to be effected by them.

After citing the long-established rule requiring such restrictive clauses to be liberally construed in favor of the person contracting for indemnity, the court further adds: " If this has been found necessary in former times in order to give effect to the contract of insurance as a real, and not illusory, contract of indemnity, it is still more necessary now, when, with the multiplication of companies holding themselves out as insurance companies and bidding for risks, legal ingenuity and practical experience and skill have been exerted to the utmost to devise terms and conditions by which the nominal underwriters may guard against a legal liability in case of loss of the property insured by the perils

proposed to be insured against." Discussing the same question, it has been said that: "The courts have looked to the circumstances, and required no more information of the party than what appeared to be within his control." *Norton v. Insurance Co.,* 7 Cow. (N. Y.) 649; *Lawrence v. Insurance Co.,* 11 Johns. (N. Y.) 260; *Nason v. Harvey,* 8 Exchg. 819.

Conditions requiring "immediate notice" upon the occurrence of loss or default have been held satisfied by notice given within two days to two months; the time varying with the circumstances of the particular cases. *Building & L. Ass'n v. Fidelity Co.,* 118 Iowa, 735; *Harnden v. Insurance Co.,* 164 Mass. 382 (41 N. E. 658, 49 Am. St. Rep. 467); *Insurance Co. v. Scammon,* 100 Ill. 644; *Wooddy v. Insurance Co.,* 31 Grat. (Va.) 362 (31 Am. Rep. 732); *Insurance Co. v. Gould,* 80 Ill. 388; *Kentzler v. Ass'n,* 88 Wis. 596 (60 N. W. 1002, 43 Am. St. Rep. 934). In *Peele v. Provident Fund,* 147 Ind. 543 (44 N. E. 661, 46 N. E. 990), the contract of indemnity was against accidental injury, and made subject to the condition that written notice of the injury with statement of the particulars of the accident should be given to the insurer, and that "failure to give such notice within ten days from the date of either injury or death shall invalidate any and all claim under this certificate." The insured person was drowned, and, while the fact of such death was known to his wife immediately after its occurrence, yet she did not know its accidental character until more than ten days had elapsed; but, when she ascertained the truth, she acted promptly, and notice then given was held to satisfy the condition. In reaching this conclusion, the court lays considerable stress upon the provision, similar to the one in the case at bar, which requires the notice to be accompanied by a showing of the particulars or circumstances of the alleged default, or loss for which indemnity is claimed, and, after saying that, in the interpretation of such conditions, courts are dis-

posed to look to the intention and substantial rights of the
parties, adds: " A distinction has been made between con-
ditions preceding the loss or accident and upon which the
question of liability primarily rests, and conditions which
relate to matters following such loss or accident. The
former are more usually of the essence of the contract,
and are therefore generally interpreted more strictly.   When,
however, the liability has once accrued such conditions as
relate to the giving of notice, making proofs of loss, etc.—
that is, conditions subsequent to the capital fact of liability
— have, in general, been interpreted as requiring what is
reasonably possible on part of the beneficiary."   Applying
the rule to the case then being heard, the court further says
that as the particulars of the accident could not be given
until, acting with reasonable diligence, plaintiff obtained
knowledge of them, the notice given " was reasonably suffi-
cient as within the terms contemplated by the parties when
the contract was entered into."   In overruling a petition
for rehearing in the same case (147 Ind. 543, 46 N. E.
990), the court repeats:   " A notice before full particulars
were known would not have been a compliance with the
condition.   Before the coroner's verdict, it was not known
and could not be known that Mr. Peele's death was accidental,
to say nothing of being able to give the particulars of such
accident.   The notice was given at the earliest date possible,
and was in full compliance with the object and purpose of
the condition as it must have been understood by the parties
at the time of the contract."   The same rule was applied
in a parallel case by the New York court   *Trippe v. Prov-
ident Fund,* 140 N. Y. 23 (35 N. E. 316, 22 L. R. A. 432,
37 Am. St. Rep. 529).   There the insured was accidentally
killed, but the fact and the circumstances of his death was
not known to a certainty for a period of several days there-
after.   Within ten days after such discovery, but more than
ten days after the accident, notice was given and held to be
sufficient.   The court says:   " The parties having contracted

that the notice should be accompanied by full particulars of the manner in which it occurred and the attendant circumstances, they evidently intended that it should be given only when the fact and manner of death became known to the parties who were required to act. The fair and reasonable construction of this condition, therefore, is that the ten days within which the notice was to be given did not begin to run from the date of the accident, but from the time when the body was found, and the important fact of death with the circumstances and particulars under which it occurred." The same principle has been recognized by the Supreme Court of the United States, and applied to policies of fire insurance, *Insurance Co. v. Boykin,* 79 U. S. 433 (20 L. Ed. 442), where it is said that, if the insured party is so insane as to be incapable of an intelligent statement, that of itself would excuse the performance of a condition requiring him to give notice and proof of loss within a fixed period. To the same effect, see *Indemnity Co. v. Fletcher,* 5 Ohio Cir. Ct. Rep. 636, 3 Ohio Ct. Dec. 308; *Gerling v. Insurance Co.,* 39 W. Va. 699 (20 S. E. 691). Among many other cases holding to the same liberal interpretation of conditions of this nature are *Konrad v. Casualty Co.,* 49 La. Ann. 636 (21 South. 721); *Insurance Co. v. Scammon,* 100 Ill. 648; *Insurance Co. v. Evans,* 102 Pa. 281; *Ward v. Ass'n,* 4 W. R. 605; *Mandell v. Fidelity Co.,* 170 Mass. 173 (49 N. E. 110, 64 Am. St. Rep. 291); *McElroy v. Insurance Co.,* 88 Md. 137 (41 Atl. 112, 71 Am. St. Rep. 400); *McNally v. Insurance Co.,* 137 N. Y. 389 (33 N. E. 475); *McElroy v. Insurance Co.,* 88 Md. 137 (41 Atl. 112, 71 Am. St. Rep. 400).

In the last-cited case payment of a life policy was conditioned upon the presentation of notice of claim and proof of death within ninety days after the decease of the insured. Knowledge of his death was not obtained by the party entitled to the insurance for nearly a year after its occurrence when she at once gave notice. In overruling

the defense based on the condition for notice within a fixed limit of time, the court says: " It is perfectly clear that the rule was made for ordinary cases where the existence of the policy and the death of the insured are known or might or should be known in time to comply with the rule. It cannot reasonably be supposed that the holder of the policy could be required to give proof of a fact of which he himself was ignorant."

Now, in the case at bar, we have already noticed that the alleged default in the performance of the contract was of a secret and fraudulent character. The court found — and, the evidence not being preserved, we must presume the finding correct — that the bridge company for which appellant became surety, having procured the contract, fraudulently prepared new specifications for the manufacture of the materials to be used, which, while preserving the general features of the agreed plan as to form and appearance, systematically scaled down the amount and weight of the several parts composing the bridges, so that, when completed, said structures and substructures contained less steel than was contracted for to the amount of one hundred and thirty-three thousand, nine hundred and ninety-two pounds, valued at $4,845.24. It is thus established that the contract was violated at the very outset, and that the fraud of the contractor marked each successive step from the manufacture of the material to the completion of the work. The concealment of the imposition from the county was accomplished, as we shall hereinafter see, by a corrupt combination or conspiracy between the contractor and the agent or engineer, who was supposed to be acting in the county's behalf. There is nothing in the contract which casts upon the county the duty to discover this fraud until the bridges were completed and tendered for its acceptance and reasonable time given to ascertain the facts. Indeed, if the county was to carry such risk, there was no occasion for any bond any more than a property owner could have occasion for insurance

against fire if in the end he is to be charged with the very risk against which his policy nominally indemnifies him. The contracts in question call for completed bridges, and it is the condition and quality of these completed structures which are to be considered in determining whether the contractor has faithfully performed its agreement. That is the earliest date at which the county could have maintained an action of this character, and, if, acting with reasonable diligence, the fraud was not known until later, the limitation upon such right of action whether by statute or by contract would not begin to run until such discovery. *Reed v. Insurance Co.,* 103 Iowa, 310; *Ellis v. Insurance Co.,* 64 Iowa, 507; *Matt v. Ass'n,* 81 Iowa, 135; *Küsel v. Insurance Co.,* 131 Iowa, 54; *McConnell v. Association,* 79 Iowa, 757. In each of the cases here cited it was held that a limitation requiring the action to be brought " within one year from the date of death " or " within six months from the happening of the death on account of which the action is brought," or " within six months next after the fire," or " six months next after the occurrence of the loss," does not begin to run according to its literal terms at the date of the death, loss, or injury, but at the date when the right of action for the indemnity matures. While these cases are not entirely parallel with the one at bar, they are not without analogy thereto, and afford instructive illustration of the principles which the courts are disposed to apply to cases of this nature. Following the rule of the authorities to which attention has been called, we think the trial court was not in error in holding that the notice to the surety was given in due time.

As the Kilburn Bridge was not yet completed when the fraud was discovered and notice promptly given to the surety, there is no room for doubt that such notice was timely. The Selma Bridge had been completed, and a few days had intervened before, the truth as to its defective condition was ascertained by the county and the surety apprised thereof.

Whether the county had been reasonably diligent and acted with reasonable promptness was a question of fact; and, the evidence not having been preserved, we are bound to assume the correctness of the trial court's finding thereon.

II.   The next defense seriously urged upon our attention is that the county paid the contractor in excess of the installments provided by the contract and before the amounts so paid were due; thus releasing the surety from liability.   The facts bearing upon this contention are as follows:   Each contract contained the provision that, in consideration of the performance thereof, the county would pay the agreed price of the work in installments as follows, to-wit: " Seventy-five per cent. of cost of materials on their delivery and acceptance, provided, however, the same does not exceed the sum of seventy-five per cent. of contract price, and the balance on the completion and acceptance of said work."   From time to time, as the work progressed, the contractor made out bills purporting to show the delivery on the ground of materials such as were called for by the specifications. These bills were indorsed as approved by one Booth — an engineer employed by the county and supposed to be acting in its interest — and, being thereafter indorsed or O. K.'d by one of the board of supervisors, the county auditor issued warrants thereon, which were paid by the treasurer.   These bills, in pursuance of the fraud which permeated the entire work, were made to show materials furnished of the weight and value contemplated by the contracts.   Except in a single instance, which we shall hereinafter mention, the payments made during the progress of the work were not in excess of seventy-five per cent. of the cost of the materials furnished as shown by these falsified bills, but as it now appears, each was in excess of seventy-five per cent. of the actual cost thereof by reason of this substitution of the lighter materials. The exception to this statement has reference to a bill presented showing an expenditure for materials of $2,950.20,

4. SAME: payments to principal: reserve: liability of surety: estoppel.

on which a county warrant was issued to the bridge company for more than seventy-five per cent. of the sum named. Soon thereafter the bridge company refunded a large part of the sum so obtained; thus making the net payment considerably less than seventy-five per cent. of the bill presented. Taking these facts into consideration, and still omitting any reference to the complicity of the engineeer, Booth, in the transaction to the effect, if any, of his agency upon the rights of the parties, we have to inquire whether the excessive payment thus secured will operate to release the surety who has undertaken to stand sponsor for the faithful performance of the contract.

For the purposes of this case, it may be conceded to be the general rule that, if the obligee in a bond to secure the performance of a building contract fails to retain the reserve which by the terms of the contract he is to withhold until the work is completed, or until certain conditions are complied with, or if he pays the contractor installments of the agreed compensation before they are earned or become due, the surety will be discharged. But is such rule applicable in the case before us? The bridge company undertook to construct the bridges of materials of a definite kind, character, and quality, and was entitled to receive seventy-five per cent. of the cost of such materials as the same were from time to time delivered upon the ground in readiness to be used in the work of construction. To insure the faithful performance of this as well as all other stipulations of the agreement by said company, the appellant became surety upon its bond. The company did not faithfully perform its contract but substituted lighter and inferior materials, and by false vouchers showing apparent compliance on its part induced the officers of the county to issue to it warrants in excess of seventy-five per cent. of the real cost of the materials, but not in excess of what was due on the showing made by such vouchers. If we were to hold that this operates to discharge a bond given to secure the performance

of the contract, it is equivalent to saying that the surety may reap advantage by the default of the very party against whose failure he has undertaken to indemnify the obligee. That this may not be done is a fundamental principle in the law of suretyship. *Ryan v. U. S.* 86 U. S. 514 (22 L. Ed. 172); *Consaul v. Sheldon,* 35 Neb. 247 (52 N. W. 1104).

The contract for the performance of which appellant became surety was not merely to construct certain bridges according to certain plans. By the express terms and necessary implication of the writing, the company undertook to present true and correct bills of the cost of materials furnished from time to time as a basis for payments to be made. If, in violation of that contract obligation, it presented claims or vouchers which concealed the fraudulent substitution of the inferior materials, and thereby obtained payment in excess of the sum really due, we see no reason why an action will not lie upon the bond against both principal and surety to make good the injury thus inflicted. The decisions in *Commissioners v. Branhan* (C. C.) 57 Fed. 179, and *College v. Meagher,* 11 Ky. Law 112 (11 S. W. 608), are not, as we read them, inconsistent with this conclusion. In the former the payments were to be due upon estimates to be made by the plaintiff itself or by its own engineer; and the court held, in effect, that its negligence in failing to perform this requirement on its part, and in making payments upon a false statement to the commissioners that the money had been earned, released the surety. The latter case holds the same rule, saying that, under the terms of the contract, it was the duty of the owner not to pay until the work was inspected and approved by a man of its own selection. As applied to the facts involved in those cases, we are not disposed to quarrel with the results there reached. *Goodwin v. Ohio,* 18 Ohio, 6, is also cited as authority for the proposition that a settlement between a county treasurer and board of supervisors will release the

sureties upon the treasurer's bond, even though the settlement be obtained by his fraud. If such be the holding of the cited case, we think it unsound in principle, and we cannot consent to follow it. See *Township v. Morris,* 91 Iowa, 198. That there was a substantial failure to complete the bridge according to contract admits of not the slightest doubt. This capital fact established, the liability of the surety follows as of course, unless it had been released by some act or omission on part of the county. The payments made by the county were in strict accord with the contract, and they now appear to have been overpayments simply because of the violation of that contract by the principal in wrongfully substituting inferior materials in the structures, and in presenting false vouchers of their cost. It would be a reproach to the law to validate such a defense.

This conclusion is strengthened and emphasized when we take the next step, and consider the further proposition that the county employed Booth as an engineer to inspect the bridge materials and to protect the interests of his principal therein, and that he approved the bills on which the payments were made, from which circumstances it is argued that the county is estopped, as against surety at least, to recover for the alleged default of the contractor in this respect. The trial court found, and we must take it as established, that Booth, while professing to represent and serve the county, entered into a conspiracy with the bridge company; acting by its president, one Wetherell, to defraud the county by permitting said company to construct the bridges of inferior materials, and to conceal the fraud from the county; and that, in pursuance of such corrupt combination, Booth did certify to the correctness of the false vouchers presented by the contractor, knowing them to be false, and thereby induced and procured the payments to be made thereon. It would be a travesty on justice for us to hold that the surety for the performance of a contract is released from his obligation because his principal corrupted the agent

of the obligee, and thereby induced the latter to act upon the theory that the work had been faithfully done.   In *Ryan v. United States,* 86 U. S. 514 (22 L. Ed. 172), a bond was given for the transportation of certain boxes of tobacco which were the subject of a revenue tax to a government warehouse in New York.   On arrival at the warehouse, the boxes were found to be filled with brickbats and other refuse, instead of the prescribed goods, and suit was brought upon the bond. Among other defenses it was urged that the officer whose duty it was to inspect the goods before shipment did it so negligently that the success of the fraud should be charged to his carelessness, and that the sureties were thereby released.   To this proposition the court, by Miller, J., says that, even conceding the alleged negligence, it would not release the sureties from the obligation they had voluntarily assumed.   " The very purpose of the bond was to secure the United States against the fraud of their principal, and the fraud was committed by him in the matter which the bond was designed to guard against.   To say that the carelessness of the revenue officer made this fraud easier of accomplishment cannot release the sureties from their obligation."   If negligence in the inspector employed by the obligee will not release the surety from liability to answer for the fraud of his principal, how much less will such surety be heard to claim a release because his principal succeeded in corrupting the inspector.   In *Steel Co. v. Van Buren County,* 126 Iowa, 606, we had to deal with the same contracts which are here involved and the circumstances under which the payments thereon were made.   We there held that the county could, in no event, be bound or estopped by the act of the engineer in collusion with the contractor.   True, the surety was not a party to that litigation, but we are unable to see any good reason for refusing to apply the principle there approved to the issues here made.   To hold otherwise is to make it to the interest of every surety on a bond of this character that his principal for whose faithful

performance of contract obligations he has undertaken to stand good shall defraud the obligee in such performance, and successfully conceal the same for a period of ten days, or shall obtain a payment which is in excess of the amount due only because of his concealed fraud in the character of the work performed. Stripped of all unnecessary verbiage, and stated in briefest terms, the position of appellant upon this phase of the case is that, while the payments made by the county during the progress of the work were not in excess of seventy-five per cent. of the cost of the materials, had they been such as the contract contemplated, and such as were shown by the vouchers presented, yet, being in excess of seventy-five per cent. of the cost of the inferior materials wrongfully and secretly substituted by the party for whose faithful performance of the contract the bond was executed the surety thereon is released from liability. We are not willing to affirm such a rule.

There is another and very proper ground upon which the claim of appellant to be discharged because of the payments to the contractor may well be overruled. Even if we take the construction of the bond for which counsel insist, the payments, even if excessive as compared with the actual cost of the substituted materials, were made upon the engineer's estimate, and were therefore in strict accord with the contract. If those estimates were fraudulently exaggerated in the interest of the bridge company, it is not in position to refuse to be bound thereby, nor can its surety take advantage of it. *Finney v. Condon,* 86 Ill., 78.

III. The appellant further claims to be relieved from its obligation as surety because of material changes in the contract between the county and the bridge company. This

5. SAME: modification of contract: notice.

defense is grounded upon the alleged fact that the county permitted the bridges to be erected of materials of a substantially different kind and character from those provided for in the original agreement. It is undoubtedly a correct proposition of law that, if the obligee

in the bond materially modifies or changes the contract with the principal without the consent or waiver of the surety, the latter is thereby released from further liability; but we find nothing in the facts of the case before us calling for an application of the rule thus invoked. It is true that the bridges as erected were not such as the contractor undertook to construct, and it is that very fact which affords the basis of the claim sued upon in this case. If the changes were made with the knowledge and consent of the county, of course there can be no recovery against either principal or surety on the bond. The trial court found that the county did not consent to or have knowledge of the act of the contractor in making the changes and substituting inferior materials in such construction; and with this conclusion we are not authorized to interfere. The county cannot be charged with notice because of the knowledge of its engineer, who was acting in collusion with the contractor in the scheme to defraud his employer. *Steel Co. v. Van Buren County, supra; Hummel v. Bank,* 75 Iowa, 689.

We are not perpared to admit the correctness of the position advanced by counsel, to the effect that, under the terms of the contract, it was the duty of the county to know the progress of the work and the kind and character of the bridges that were being erected, and, on peril of discharging the surety, discover each default of the contractor as it occurred during the progress of the work, and give notice thereof to the surety within ten days from the act complained of. This subject has already been sufficiently treated in a previous paragraph of this opinion, and it is unnecessary to further extend its discussion.

In the reply brief for the appellant suggestion is made that the obligation of the surety company upon the bond in suit is that of guarantor, rather than of surety, and that 6. GUARANTY: liability of guarantor. one who occupies the former relation will be released from his obligation by the negligence or fault of the obligee under circumstances which

might not be sufficient to release a surety.  Conceding, for the purposes of the present case, that the distinction thus made is technically correct, we cannot see how it can be made to avail for the release of the appellant from its bond. If the guaranty be absolute, the liability of the guarantor is as broad and complete as that of a surety, and, if it be conditional, it is a fundamental rule that failure to give notice of the principal's default will not discharge the guarantor in the absence of any showing of prejudice to the latter resulting from the laches.  As we have already noted, the conditions relied upon are not precedent to the appellant's liability, but, assuming the existence of such liability, they go solely to the question whether the appellee has forfeited or lost its right to enforce it.  If the obligee in such a bond has acted in good faith and with reasonable diligence, if by no default on its part has the obligor been prejudiced, and especially if the delay, if any, has been caused by the secret and fraudulent character of the violation of the very contract for the faithful performance of which the bond was given, we think there is nothing in the law of suretyship or of guaranty which requires us to hold that the obligation is thereby discharged.

Other questions argued by counsel, so far as they are within the record before us, are fairly governed by the conclusions already announced.

No reversible error has been shown, and the judgment of the district court is *affirmed*.