HERMAN F. VOLQUARDSEN, Appellant, v. DAVENPORT HOSPITAL and STOCKMEN'S SAVINGS BANK OF LONG GROVE, IOWA.

**Building contract:** CHANGE IN PLANS: JUSTIFICATION: EVIDENCE. In this action upon a building contract, in which the defendant counterclaimed for delay and defective work, the evidence is held to show that the construction provided for in the plans and specifications, though difficult in some respects, was not impossible of performance; and even though difficult in some respects that fact was not ground for pursuing a different method of construction.

**Same:** BREACH OF CONTRACT: DAMAGES. Under a building contract providing for no change or deviation from the plans and specifications except upon the written consent and order of the architect, together with a statement of the cost of the change, the architect had no authority to make a change in the construction except upon the terms and conditions thus provided; and in making a change in the construction simply upon the oral permission of the architect the contractor was liable for damages caused by the breach.

**Same:** BREACH OF CONTRACT: EVIDENCE. Under the provison of the contract in suit, wherein it was agreed that the structure should be completed within five working months, defined as those months when the weather would permit of the kind of construction provided for, the evidence is held to show that the structure was completed within the stipulated time.

*Appeal from Scott District Court.*—HON. A. J. HOUSE, Judge.

WEDNESDAY, MAY 14, 1913.

SUIT to establish mechanic's lien for balance owing for the construction of a hospital. A counterclaim was filed, and

on hearing $800 was allowed thereon, and deducted from the contract price. The plaintiff appeals. *Modified* and *Affirmed*.

*Thuenen & Shorey,* for appellant.

*Carroll Bros.* and *Ruymann & Ruymann,* for appellees.

LADD, J.—On November 19, 1908, Phillips & ·Volquardsen entered into a written contract with the Davenport Hospital, a corporation, for the construction of a building to be used as a hospital. The price with extras amounted to $13,342.90, of which all but $3,120.80 was paid. Claim for a mechanic's lien was filed, and suit to foreclose the same begun by Volquardsen, to whom Phillips had assigned any interest he had in the claim. By way of counterclaim defendant demanded $1,680 as liquidated damages for delay in completeing the building, and $400 as damages because of defective cement work. Other items, not having been allowed, need not be mentioned.

I. The specifications exacted that the floors of the first and second stories and of the hall to the third story of the building "be finished on top with a top dressing three-fourths inch thick put on at the same time as the body of the floor and composed of two parts of Chicago A. A. cement to one part of fine sand and one part of crushed and powdered marble dust or limestone." There was to be a cement base "3 inches high to project ¾ of an inch from plaster above and to be put in place by the concrete floor contractor at the same time and of the same materials as the topping. . . . The lower section of each mackolite partition is to be put on first directly on the body of the floor, and the base then brought upon this." The contractor contended that this method of construction was impossible of performance, for that, as the engineer of the subcontractor testified:

1. BUILDING CONTRACT: change in plan: justification: evidence.

The specifications call for the topping of the floors and the base to be all of one job, so there would not be any connecting cracks. That could not be done because you could not keep the tile in line in order to get your cement base on, and it took too much time to set the tile and the concrete. The concrete for the whole building is poured in one day. It is supposed to be poured in one operation. There were innumerable partitions throughout the building, and it was impossible to plaster up against there. The specifications provided for a construction that was impossible. I informed the architect. . . . I made the suggestion of putting on the cement topping at the time the floors were poured, and leave a space for the partitions to be put in afterwards, and set the base in and told him that would be the way to get a good job, and Mr. McLane objected to it, but said the proposition had considerable merit, but ordered us to go ahead and put it in the other way. . . . I discovered that it was impossible to fill the contract we took from Volquardsen. My own firm took a contract that it was impracticable to fulfill—impossible. An experiment was made to discover what could be done to make the stuff bind after they objected to putting it on as I wanted to. I wanted to put the topping on when I poured, and leave a space for the tile partition and the cove. The architect objected to doing that. We eventually put on a top coat.

The architect rejected the proposition of the engineer, and against his protest directed that, after the concrete had dried, the topping be poured on. It did not attach to the concrete below, and, as a consequence, when dry, cracked. In that condition it was $400 less in value than had the work been performed according to the specifications. The architect testified that the method exacted by the specifications was difficult, but not impossible.

And the difficulties of the construction were very greatly increased on account of the weather conditions, because work done in the winter must be done quickly, and with these partitions resting on the floor it would take four or five days to put in a floor when otherwise it could be done in one day. So that the question of how to construct a floor was very

.thoroughly discussed by Mr. Graham and myself. The question of putting in the floor first naturally brought up the question of topping; the question of topping could not be put in the same time unless the partitions were set. We discussed several methods by which the bases could be constructed, but all seemed impracticable for winter work, but it was understood the work was to be carried on during these cold winter months. . . . The difficulties of the construction were thoroughly gone into and it was mutually agreed— I recognized the difficulties as he presented them, and it was mutually agreed that under the circumstances it might be better to proceed in another manner. . . . It is the best practice to put it on at the same time. Good engineers do it in cases where it is necessary. I have seen jobs of that kind. It wasn't put on out here the way they agreed to put it on.

.The other two witnesses on this subject, Volquardsen and Major, did not disclose knowledge on this issue entitling their opinions as to whether the method prescribed was possible to any considerable weight. The contractor as well as the subcontractor undertook to put the topping on in the manner specified, and we are not satisfied from the evidence that this was impossible. Doubtless it would have been difficult, especially in the winter season, but this furnished no excuse for noncompliance with what had been agreed upon, nor did the oral assent of the architect justify performing the work in a different manner.

It was not a case of discrepancy between the drawings and specifications, nor a dispute as to the true meaning of these, but a distinct change or alteration in what the specifications required, and both the architect and contractor recognized it as such. The contract expressly provided that "there must be no changes made in them (specifications and drawings), nor deviations from them without the written consent of the architects." And it also declares that "no alterations shall be made in the work except upon written order of the architect" with amount of cost thereof. Such provisions

2. SAME: breach of contract: damages.

are binding on the parties. The architect's authority is limited. He may not direct the work to be done otherwise than is provided by the plans and specifications, except as he has been given authority so to do therein or by the contract. Unless so authorized, he is powerless to relieve the contractor from complying with his undertaking in order to make it easier for him or for any other purpose, if this be detrimental to the owner. In adopting a different method than that prescribed the contractor did so at his own risk. *Lumber & Coal Co. v. Garmer*, 132 Iowa, 282. It is not pretended that the architect's assent or direction to change was reduced to writing, and, in the absence of written instructions, the owner is not bound at all by what the architect may have done in these matters. That it may have been difficult to comply with the contract did not waive this rule, nor does this furnish any excuse for nonperformance. 6 Cyc. 54; *Smith v. Scott's Ridge School District*, 20 Conn. 312. Such matters are deemed to have been taken into account in making the agreement. As said in *Burke v. Kansas City*, 34 Mo. App. 570, the provision "that the builder is to build according to directions of the architect should be construed to mean such directions as he may give looking to the completion of the work according to the plans and specifications, and not to mean that he may give for an improvement in a manner different from that provided in the plans and specifications." There was no error in awarding damages in the sum mentioned because of defective cement work.

II. By the terms of the contract, the work was "to be completed ready for finishing by the painter not later than five working months from the date of signing the contract."

3. SAME: breach of contract: evidence.

This happened November 19, 1908, and the trial court found that the work was so finished by September 1, 1909. Without reviewing the evidence bearing on this point, it is enough to say that this finding is sustained by the record. The agreement defines "working months" as "all such months occupied by the erec-

tion of the building during which the weather is of such character as will permit, in the opinion of the architects, of the proper prosecution of reinforced concrete work. Account of weather such as will, in the opinion of the architects, not permit of the prosecution of the reinforced concrete work will be kept by the architects, and the account thus kept by them shall determine the date for the completion of the building. The work must be prosecuted continuously when the weather will permit.'' The evidence discloses that concrete work might have been prosecuted when the weather was at freezing point or two degrees below, and the architect found that there had been one hundred and twelve days' delay. This estimate was based on weather observations of his own in connection with the government weather reports. The table prepared by him, however, differs widely from that of the official record of the forecaster at Davenport, and owning to the scientific accuracy of observations under government supervision, and inasmuch as the account kept by the architect is not made conclusive, we are inclined to accept the latter. The architect was asked: ''How many days is it necessary to have weather above freezing point in order to work to advantage with concrete work?'' and answered, ''I would say two or three days.'' This test is nowhere questioned, and may be applied in connection with the condition of the weather from November 19, 1908, in ascertaining whether there was delay for which plaintiff should respond in damages. J. M. Sherrier testified that he was ''local forecaster for the United States Weather Bureau'' at Davenport, had an official record of the temperature from November, 1898, to March, 1909, inclusive, and the minimum temperature for each day ending at midnight was thus proven. Therefrom it appeared that the first two days of the contract were followed by one with the temperature six degrees below freezing. Two days according to this test must then elapse before the work might have proceeded, and these were followed by three days where the temperature was high enough to work. It could not have been resumed until December 16th,

and then but for a day. Conditions again were such that on January 23d and 24th it might have been prosecuted, and not again until February 23d for a single day. Work might have been resumed again March 7th for two days and March 21st for five days. These calculations are on the theory that the temperature must have been above freezing for two days before work might be prosecuted. If these were to be included, then they should be added at each time. Thus scattered through the three and one-half months are fifteen to twenty-three days during which according to the architect's own test the contractor might have worked. But nothing could have been gained by intermittent effort such as this would have involved, and, judged by the official record of the weather with this test applied, there can be no doubt but that plaintiff was not guilty of delay such as is condemned by the contract in providing for liquidated damages. Moreover, it appears from a clear preponderance of the evidence that work of this kind cannot well be prosecuted during this period. True, the foundation and some other work was performed, but, according to the weight of evidence, nothing was gained by beginning before April, 1909. A careful examination of the record has convinced us that the court erred in allowing anything as damages for delay, and the decree will be so modified as to award plaintiff judgment for $2,720, with interest from October 1, 1909, at the rate of 6 per cent. per annum.

*Modified* and *Affirmed.*