F. E. MARSH & COMPANY, Appellant, v. LIGHT & POWER COMPANY OF ST. ANSGAR et al., Appellees.

**CONTRACTS:** Performance—Acceptance of Work. A designing and
1   superintending engineer who has contract authority (1) to act as
final arbiter of disputes arising out of a building contract, and (2)
to determine when the contract has been completed according, to
contract, has no authority to change the plans and specifications,—
no authority to authorize the use of work and materials substantially inferior to those which are called for by the contract; and
his acceptance of the work when it carries such defects is not binding on the owner of the improvement.

**CONTRACTS:** Construction—In re Foundation of Structure. A con-
2   tract which calls for the foundation of a structure to be carried
down to solid rock precludes a claim for ''extras'' because ''solid
rock'' was found at a greater depth than was expected.

*Appeal from Mitchell District Court.*—C. H. KELLEY, Judge.

NOVEMBER 16, 1923.

ACTION for balance claimed to be due under a contract for the construction of a dam and power plant on the Cedar River, near St. Ansgar, Iowa, and for extra material and labor furnished, and to foreclose mechanics' lien. Defendants counterclaimed, demanding damages on account of defective construction.. The decree entered allowed the original contract price and certain items of extras, and disallowed all other items sued on, denied mechanics' lien, allowed damages on counterclaim, and rendered judgment against plaintiff for $24,783.95. Both parties appeal. Plaintiff perfected its appeal first, and will be styled ''appellant,'' and defendants, ''appellees.''—*Modified*

*and affirmed on plaintiff's appeal; affirmed on defendants' appeal.*

*Kugler, Bartlett & Spaanum* and *Stipp, Perry, Bannister & Starzinger,* for appellant.

*William H. Salisbury,* for appellees.

ARTHUR, J.—I.   Appellee Light & Power Company, desiring to construct a power plant on the Cedar River, employed George D. Dobson, of Des Moines, as engineer, to design the plant.   The contract between the company and Dobson provided that Dobson should make plans and specifications for the dam and power house at the site selected; that Dobson should make "necessary soundings, to ascertain the character of the foundation at the dam site; to be present and assist the committee in receiving bids and awarding the contract;" and, "after completion of the structure, to make final inspection of same."   In pursuance of this contract, Dobson prepared plans and specifications.   Appellant was the successful bidder, and the job was awarded to it.   On or about the 3d of July, 1919, the parties entered into a written contract, whereby appellant agreed to furnish the materials and perform the work for the erection and completion of a power house and concrete dam across the Cedar River, at the site selected, for the agreed price of $30,000.   Appellant began work on the project about July 20, 1919, and the dam, sometimes referred to in the record as "the spillway," 150 feet in length, built in three sections of 50 feet each, was completed, by pouring the last concrete into the center section, on February 7, 1920.   The lower portion of the power house, together with the penstocks and water gates, had not been completed, and the superstructure of the power house had not been completed, at the time the concrete was poured into the center section of the dam.   About the 11th of March, 1920, there came a thaw, and the river rose, and at midnight on March 16th washed around the west end of the dam and under a diversion wall which had been built, under a separate contract, from the northwest abutment, some 65 feet to the northwest.   Thereafter, appellant completed the superstructure of the power house, and called upon Dobson, the engineer, to inspect the project.   At

the request of O. H. Koch, secretary of appellee company, the next morning after the disaster, Dobson went to the plant, and met with the committee of appellees, and visited the site, and made a general inspection of the conditions as they existed. At that time, there was some criticism by the committee as to the quality of the work, and appellant was told by the committee representing the owners to go ahead and complete the work, and that, when they got through, they would be paid. The top of the spillway was to be repaired, where it had been damaged by the ice gorge, and the power house completed, and then Dobson was again to inspect the plant. On April 23, 1920, after certain repairs had been made, as directed by the engineer, and after the power house had been completed, another meeting was held, at which were present a representative of the contractor, the owners, and Dobson, engineer; and at that time, Dobson again examined the work, and gave orders for certain further work to be done by the contractor. Dobson had been employed by appellees' committee to prepare plans to close up the gap made by the river around the west end of the dam; and after the preparation of same, he returned to St. Ansgar, and made a further inspection of the dam. At this time, Dobson looked over the project with Stinson, construction engineer of appellant, and directed Stinson to make repairs to the surface of the concrete in the spillway, and other repairs. On April 23, 1920, Stinson wrote to Dobson, stating:

"They followed your instructions in patching the top of the St. Ansgar dam. They completed the same; also repaired the break in the center section you reported. This I believe completes the same."

After Stinson had so notified Dobson, Dobson inspected the plant, and addressed to O. H. Koch, secretary of appellee company, on May 7, 1920, the following letter:

"I beg to report that I visited the site of the Light & Power Company dam and power house on the Cedar River on May 5, 1920, to make final inspection of the same. I find that Mr. Stinson, foreman for F. E. Marsh & Company, has complied with my order given him on April 21st and has made the required repairs to the spillway to replace the damaged concrete, and that the contractor has substantially complied with the

plans and specifications, and that the contract has been fulfilled.''

After said approval of the structure by Dobson, as ''designing engineer for the Light & Power Company of St. Ansgar, Iowa,'' that ''the contractor has substantially complied with the plans and specifications and that the contract has been fulfilled,'' appellant demanded balance of the money due him under the original contract and the subsequent contracts, and appellees refused to pay same. Certain negotiations of settlement were made by the parties, but not completed. Thereafter, appellant filed its claim for mechanics' lien, claiming a balance due on its account, of $12,507.84, and later instituted this suit, demanding on the account, and praying for establishment of its mechanics' lien against the plant.

In addition to the contract price of $30,000, appellant includes in its account charges for materials and labor for certain extras which it claims were not covered in the original contract. It is not necessary to set forth all of the items claimed as extras. It is sufficient to say that claims for extras were allowed in the amount of $3,039, and the court denied recovery for other items of extras claimed. Appellees have paid appellant $28,572 on the original contract. The court found for appellant, that it was entitled to recover the original contract price of $30,000, and extras to the extent of $3,039, making a total amount of $33,039 that appellant was entitled to recover.

The items for extras claimed by appellant, which the court refused to allow and which are claimed by appellant on this appeal, are for concrete, with re-enforcing steel, and for loose rock excavation, due to increased depth of about two feet for foundation of the dam, which appellant claims it was not obliged to build, under the contract, in the amount of approximately $6,000. Some liens claimed by materialmen, which were conceded by appellant at the trial, were charged against appellant, and are not involved in either appeal. The court found that appellant is liable, and should be charged with the cost of reconstructing the west abutment of the dam, in the amount of $4,195; for the cost of repairing the power house, in the amount of $5,020; and for the cost of repairing the dam, or spillway, $19,835. Appellant takes the position that it has substantially complied with the plans and specifications, and that the accept-

ance and approval of the structure by the designing engineer is final, and settles the question of compliance with the contract, and that the court was in error in charging appellant with any amount for reconstruction and repair of the plant. Subject to such contention, appellant urges on its appeal that the amounts allowed and charged to it by the court below for reconstruction and repair are excessive, and if allowed at all, should be allowed in much smaller amounts.

Appellees deny owing appellant on the contract any amount whatever, deny that appellant completed the construction of said dam and power house in accordance with the contract, and aver that appellant failed and neglected to carry out the contract, and failed and neglected to build and construct the said dam and power house, either according to the plans and specifications, or in a satisfactory, good, and workmanlike manner, aver that said dam and power house never were completed by appellant, and never have been accepted, so as to bind appellees; that portions of the structure were broken, crumbled, and swept away, because of the incomplete, faulty, and unworkmanlike manner in which the same had been constructed; that the mixture of cement, sand, and gravel of which the plant was constructed was not in proportion, and not mixed according to the plans and specifications; that the cement was not thoroughly mixed with the sand and gravel, and the mixture not laid, tamped, and bonded as required in the plans and specifications; and that the structure was faulty in other particulars; that, by reason of faulty workmanship, faulty mixture, and improper re-enforcing and bonding, the structure was weak, and gave way under water pressure; that appellant failed and neglected to carry the dam down to bed rock, as provided in the plans and specifications, and failed and neglected to clean the floor of the rock, and build cofferdams and anchor said dam to the bed rock, as provided in said plans and specifications; that, by reason of negligence of appellant in the use of faulty materials and workmanship, the water undermined the northwest dike wall, and broke through and destroyed same; that appellant was negligent and violated the contract in many other particulars; and that appellant and Dobson, engineer, were guilty of fraud and collusion.

In their counterclaim, appellees demanded damages in the sum of $18,973.91, which they claim they were obliged to expend in rebuilding the northwest dike wall which was destroyed by the flood; also, claim for amount paid appellant on the original contract, on account of liens filed by materialmen; claim damages because of the failure to complete the structure in the time provided by the contract, damages on account of faulty construction, and for failure to clear out the tailrace and remove the old dam, and other items.

The total damages alleged in the counterclaim aggregated about $72,000.   At the trial, appellees, in the evidence produced, claimed damages as follows:

| | |
|---|---|
| Amount paid by appellee on the contract price | $26,285.00 |
| Claims of materialmen not paid by appellee | 2,777.29 |
| Cost of reconstructing west abutment | 4,195.00 |
| Cost of repairing power house           . | 5,020.00 |
| Cost of repairing dam | 19,835.00 |
| | $58,112.29 |
| Cost of reconstructing the northwest dike wall | 18,973.91 |
| ' Total | $77,086.20 |

The court denied to appellees recovery for payments made on the contract price.   Claims of materialmen were conceded by appellant, and charged to it in the amount of $2,487.13; claim for reconstructing the west abutment was allowed and charged to appellant in the amount of $4,195; claim for cost of repairing power house was allowed in the amount of $5,020; cost of repairing dam was allowed in the amount of $19,835. The lower court held that the northwest dike wall was a separate project, which was completed before the disaster, substantially in accordance with the contract, and that the loss thereof falls upon appellees; and denied recovery for the cost of reconstructing said wall.   Defendants have appealed only from that part of the decree disallowing their claim for damages for the cost of rebuilding the northwest dike or extension wall.  Their notice of appeal states:

"That part of the decree and judgment appealed from is the failure of the decree and the calculation and judgment to give the defendants as counterclaimants judgment for the cost of rebuilding the northwest dike extension wall, which said cost was approximately $18,973.91. This is the only part of the judgment and decree which the defendants as counterclaimants appealed from."

However, the question of "substantial compliance" with the contract and specifications with respect to materials used and workmanship employed is necessarily involved in these appeals. If plaintiff's position is sound, that the approval and acceptance of the structure by Dobson, designing engineer, are final and binding on both parties, no amount is recoverable on the counterclaim, so far as it relates to the original contract and demands damages on account of failure to comply with the plans and specifications in the use of materials and in workmanship.

Issues which arose in evidence are too numerous to be discussed separately, and the evidence is too voluminous to be set forth within reasonable bounds of an opinion. The abstract filed by appellant contains 424 pages, and appellees filed an entirely new abstract, containing 824 pages. The pleadings alone cover about 70 pages. Also, a transcript was produced, containing about 1,400 pages, which we were obliged to resort to. Also, a great number of original exhibits were sent here. With much labor we have examined these records and exhibits, and must be content with stating our conclusions, based thereon.

II. At the threshold of our investigation is the question of whether or not the approval and acceptance of the structure by Dobson, engineer, are final and binding upon the parties,

1. CONTRACTS: performance: acceptance of work.
and effectually preclude appellees from disregarding said approval in seeking to recover on their counterclaim. The work on the structure was done under the direction of Dobson, the designing engineer, who was by the contract made arbiter in cases of dispute between the parties.

Specification No. 10 reads:

"If any difference of opinion arises between the inspector on the work and the contractor, regarding the meaning of these

specifications and plans, it shall be referred immediately to the designing engineer, who shall adjust such matters, and his opinion shall be binding on both parties.''

Specification No. 35 provides:

''Upon final completion of the work and acceptance of the same by the designing engineer, the contractor shall be promptly paid any balance of the contract price which shall then be due and unpaid.'' .

It is the position of appellant that the approval and acceptance by the designing engineer of the work of constructing the plant effectually settles the question of compliance with the contract; that the contract made Dobson, engineer, arbiter of matters of performance of the contract, and that Dobson's acceptance and approval of the job are final; that such acceptance and approval preclude recovery of damages by appellees on account of the use of materials which did not strictly comply with the specifications, or on account of faulty workmanship, even if it does appear from the evidence that the materials used did not strictly comply with the specifications, or were not the equivalent of same, or if the workmanship was not fully up to the standard provided for in the contract, in the absence of fraud, collusion, or gross mistake; and that the evidence does not support the finding of the court that the contract was not substantially complied with.

Appellees strenuously contend that the contract was not substantially complied with; that materials were used which did not meet the demands of the specifications, and that the workmanship was not of the efficient character required by the plans and specifications; that the engineer directed and permitted changes to be made in building the structure, in materials used, workmanship, and dimensions, in violation of and in substantial variance from the plans and specifications, and particularly as to the mixture of concrete and the radius of the spillway; and that the contract was not substantially complied with.

It is the general rule that the acceptance and approval of a structure by an engineer appointed by agreement of the parties to inspect and pass upon same are conclusive and binding upon the parties, in the absence of fraud or such gross mistake

as would necessarily imply bad faith or a failure to exercise an honest judgment. *Kihlberg v. United States,* 97 U. S. 398 (24 L. Ed. 1106); *Sheffield & B. C. I. & R. Co. v. Gordon,* 151 U. S. 285 (38 L. Ed. 164); *Chicago, S. F. & C. R. Co. v. Price,* 138 U. S. 185 (34 L. Ed. 917); *Elliott v. Missouri, K. & T. R. Co.,* 74 Fed. 707. We do not think that the record warrants finding of actual fraud and collusion on the part of Dobson and appellant; but it is amply established by the evidence that both the engineer and appellant were guilty of gross mistake in the use of materials and in workmanship, particularly in the work on the power house and the middle section of the dam. This being our view and holding, it follows that appellees may go behind the approval and acceptance of the engineer, and are entitled to recover damages, notwithstanding such acceptance and approval by the engineer.

The rule as to what constitutes substantial performance is well stated in *Littell v. Webster County,* 152 Iowa 206.

"Substantial performance, as defined by the cases, permits only such omissions or deviations from the contract as are inadvertent or unintentional, are not due to bad faith, do not impair the structure as a whole, are remediable without doing material damage to other parts of the building in tearing down and reconstructing, and may, without injustice, be compensated for by deductions from the contract price. So much is allowed in building contracts because of the hardship to the contractor if slight, unintentional deviations should bar his recovery."

Paragraph 16 of the specifications provides:

"The sand shall be clean, sharp, and grade from fine to coarse, free from mud, sewage, and all other injurious foreign matters. Not more than 3 per cent of finely pulverized clay shall be allowed. The gravel shall be of assorted sizes, of hard pebbles which will not disintegrate when exposed to the elements, and shall measure up to the same standard of cleanliness as the sand."

The specifications also state the manner of handling the material and placing of concrete in the structure, and provide that no concrete shall be placed after it has shown signs of hardening; that no frozen concrete shall be used; that, in case any imperfection makes it necessary to repair the surface of

any concrete, the concrete shall be picked out to a depth of two inches, and the new patch dovetailed into the old concrete; that, in freezing weather, "after concrete is deposited, it shall be protected with a covering of straw, sand, or canvas, but manure must not be used in any way that liquids from the manure may come in contact with the concrete."

The sand and gravel used in the structure were taken from the McKinley pit, pit run. The evidence shows that the sand and gravel of the McKinley pit were not of the quality required by the above quoted specification, at least in that it contained more than the percentage of clay allowed by the specifications. Appellant concedes that, but contend that they used enough more cement in the concrete mixture than required by the specifications to make the concrete used substantially the equivalent in strength and durability of the concrete required by said specifications. Upon the trial, a vast amount of evidence was introduced by both parties as to the quality of the material taken from the McKinley pit, the amount of cement used, and the character of the concrete used. Appellant virtually conceded that the sand and gravel used were not as good as required by the specifications, but asserted that the use of more cement than required by the specifications resulted in a concrete substantially of the equivalent required by the specifications; that the concrete used was the equivalent in strength and durability of the mixture specified; but that, when installed, it did not look as smooth and clear as it would have if the sand and gravel had been strictly of the quality required by the specifications. Certainly there was no actual fraud in the use of material taken from the McKinley pit. The evidence clearly shows that appellees insisted upon the use of the McKinley pit sand and gravel because McKinley had agreed with them to take stock in the plant in payment for the material, and appellant sought to accommodate appellees by using material from the McKinley pit. We think the evidence discloses without doubt that appellees, before and at the time the contract was entered into, regarded the sand and gravel from the McKinley pit as being of good enough quality with which to construct their plant in first-class manner. We think that appellees at that time would have been willing to have incorporated in the specifications that

such material should be used in the construction of the plant. We make this observation for the purpose of suggesting that the use of the McKinley pit material by appellant was not done with the purpose of perpetrating an actual fraud upon appellees. But no such agreement was placed in the contract and specifications. It was the duty of appellant, at its peril, to use a concrete called for by the specifications, or substantially the equivalent of that called for by the specifications. Appellant was under no obligation to use the sand and gravel of the McKinley pit because of the oral insistence of appellees that it be used. If, with such material, a concrete could not be and was not made substantially the equivalent of the 1-2-4 mixture provided for in the specifications, then we think that appellant was at fault in using the same.

III.   Dobson, the designing and superintending engineer, could not bind appellees by approving and accepting the plant constructed of materially different and inferior materials and workmanship from that required by the contract. *Glacius v. Black*, 50 N. Y. 145 (10 Am. Rep. 449). Dobson, engineer, had authority to hear disputes between the contractor and the owners, or the inspector of the work employed by the owners, that might arise in the progress of the work, as to whether or not materials called for by the specifications were being used, and whether or not the workmanship was of the quality called for by the contract. But said engineer had no authority to change the plans and specifications and approve and accept inferior materials and workmanship. *Foeller v. Heintz*, 137 Wis. 169 (24 L. R. A. [N. S.] 327) ; *Modern Steel Structural Co. v. Van Buren County*, 126 Iowa 606; *Van Buren County v. American Surety Co.*, 137 Iowa 490. The plans and specifications were the basis of the contract, and the engineer, Dobson, could not change the same by permitting the use of concrete composed of materials different from and not the equivalent of the 1-2-4 mixture specified, without the express consent of appellees, the owners. *Foeller v. Heintz*, supra. Dobson's authority, as supervising engineer, was limited. He had no authority to sanction and approve the use of materials or workmanship otherwise than as provided in the plans and specifications, except as he might be given authority so to do by the contract.

No such authority was given in the contract. Verbal agreements as to changes are without effect. *Volquardsen v. Davenport H. & S. Sav. Bank,* 161 Iowa 706; *Benson & Marxer v. Brown,* 190 Iowa 848. In *Volquardsen v. Davenport H. & S. Sav. Bank,* supra, quoting from *Burke v. City of Kansas City,* 34 Mo. App. 570, we said:

"The provision 'that the builder is to build according to directions of the architect should be construed to mean such directions as he may give looking to the completion of the work according to the plans and specifications, and not to mean that he may give directions for an improvement in a manner different from that provided in the plans and specifications.' "

The specifications provided:

"If any difference of opinion arises between the inspector on the work and the contractor regarding the meaning of these specifications and plans, it shall be referred immediately to the designing engineer, who will adjust such matters, and his opinion shall be binding on both parties."

It will be seen that the designing engineer is given authority only in case dispute arises between the inspector and the contractor regarding the specifications and plans. No authority is given the engineer to change the plans and specifications,— he is given simply authority to construe. *Glacius v. Black,* supra; *Modern Steel Structural Co. v. Van Buren County,* supra; *Jones v. General Const. Co.,* 150 Iowa 194. The *Glacius* case, supra, is in point. The New York court said:

"The contract provides 'that the materials to be furnished shall be of the best quality, and the workmanship performed in the best manner, subject to the acceptance or rejection of Edward Wall, architect, and all to be in strict accordance with the plans and specifications, which are signed by the parties of the second part, and form part of this contract.' The architect also had power to reject any particular work or materials; and in such case the builders were to remedy the defects. This is all the authority which the architect had under this contract, and his authority was equally known to both parties. It is quite clear to my mind that the acceptance of the work by the architect did not relieve the plaintiffs from their agreement to perform this work according to the plans and specifications. The

provisions are distinct and independent. The contract was to be performed in a certain manner, particularly specified in writing, and, in addition, it was to be subject to the acceptance or rejection of the architect; but his acceptance of a different class of work or inferior materials from that contracted for would not bind the defendant to pay for them. She was obliged to pay only where 'the work was done completely and accepted.' The provision for acceptance was an additional safeguard against defects not discernible by an unskilled person.''

IV. A vast amount of evidence was introduced by both parties respecting the quality of the material taken from the McKinley pit, the amount of cement used, and the quality of the concrete. Appellees seem to contend that the sand and gravel of the McKinley pit were of sufficient quality, if properly selected; that, if the sand and gravel had been properly selected and sufficient cement used, concrete could have been made of it which would have been the equivalent of the concrete mixture specified; but that there was too much clay in the sand and gravel in taking the run of the pit, and that there was not a sufficient amount of cement used. Appellant contends that it was obliged to take the run of the pit, if material from the McKinley pit were to be used, as insisted upon by appellees. Appellant virtually concedes that the sand and gravel of the McKinley pit were not up to the standard required by the specifications, but contends that the use of the amount of cement which it did use, resulted in a concrete the equivalent in strength and durability of the concrete specified in the contract. Appellant insists, and we think the evidence supports such contention, that a larger amount of cement was used than called for by the 1-2-4 mixture of the specifications. Appellant insists that the use of an added amount of cement resulted in a concrete equivalent in strength and durability to the concrete specified. We think this contention is substantially borne out by the record, except with respect to the middle section of the spillway and portions of the walls of the power house; and that the defects in the middle section of the dam and in the walls of the power house are due to faulty workmanship. As before adverted to, the concrete was poured into the middle section of the dam in cold weather, and some lumps of frozen material

were negligently allowed to get into the mixture, and also some foreign substances; and in the walls of the power house some sawdust was allowed to remain in the joints.

V. Appellant seeks to recover the contract price of $30,000 for construction of the dam and power house and for certain materials and labor furnished in construction of what it claims

2. CONTRACTS: construction: *in re* foundation of structure.

to be "extras," not included in the contract. The court below allowed appellant's claim for the contract price in the full amount of $30,000, and extras to the extent of $3,039, and refused recovery for other extras claimed. The denial of recovery for extras claimed in the total amount of $5,998.50 is presented in plaintiff's appeal.

Before the contract was entered into for construction of the dam, soundings across the river to ascertain the location of bed rock were made, for the purpose of informing bidders where the foundation of the dam was to be laid,—that is, how far it was down to bed rock. When the dam came to be constructed, it was found that bed rock was some two feet deeper than the soundings disclosed. The contractor, in order to place the foundations of the dam upon bed rock, had to and did excavate loose rock of about two feet in depth, and had to use concrete, with re-enforcing steel, in the lower two feet of the foundation, at an expense of approximately $6,000; and claims compensation beyond the contract price in that amount. This claim the lower court refused to allow. We think the lower court did not err in such refusal. The specifications provided:

"The foundation for the new dam and power house shall be graded down to solid rock and bonded into same as indicated in the plans."

The specifications, or any other writing, did not specify the depth or location of "solid rock." The contract compelled appellant to place the foundation of the dam on "solid rock," or "bed rock," and it cannot recover for extra materials and labor expended in the construction of the dam on a lower foundation than it expected to find.

VI. The west abutment, a part of the original project, was damaged by the flood which occurred before the job was completed. It is virtually conceded by appellant that it is liable

for the cost of reconstructing same. Appellees' witnesses placed the cost of such reconstruction at $4,195, which full amount the court below allowed. Appellant's witnesses placed the cost of such reconstruction at $1,430. We have carefully examined the evidence with respect to the cost of such construction, and we think that the amount allowed by the court is excessive. The estimates of cost made by appellees' witnesses are based upon removal of all of the two abutment wing walls. The evidence shows that the southwest wing wall was not injured in any way. In the estimates made by appellees' witnesses, the charge for concrete was estimated at $40 per yard. We think this should be reduced to $25 per yard, because the record shows, we think, that to be an adequate price. Also, the record shows that the flood swept away the old concrete and rubbish, and that the charge made in the estimate of appellees' witnesses for removal of the old concrete is superfluous. We think that the amount allowed by the court should be reduced, on account of these two items, in the amount of $875, thus reducing the amount allowed by the court to $3,320. We think that a fair estimate of the cost of this repair is not more than $3,320; and the amount allowed by the court is reduced to $3,320.

VII. The court below found that the power house is defective in construction, and that the expense of repairing same should be borne by appellant. The court was right in such finding. The court allowed as the cost of repairing the power house $5,020. We think that, under the evidence, the amount allowed is excessive. The principal complaint made of the construction of the power house, as we understand the record, is that it was not made in one continuous pouring, and that some foreign material, such as sawdust, was allowed to remain in the joints between the different pourings of concrete. We conclude from the evidence that the construction joints may be chiseled out and rebonded with cement, and the construction thereby be made good and permanent. We think that $3,000 will be ample for such purpose, and for other necessary repairs to the power house; and the amount allowed by the court below is reduced to $3,000.

VIII. Appellees claim, and the court below found, that it is necessary to a proper repair of the dam that a jacket three

feet thick be placed over the entire spillway. We conclude from the evidence that the dam as constructed is of sufficient volume, weight, and strength. The middle section was constructed in cold weather, with the result that some frozen materials and foreign substances got into the concrete mixture, thus preventing proper uniting and hardening, and resulting in the concrete's remaining somewhat soft.

We think that the court's finding that it is necessary to cover the entire spillway by the proposed jacket is not justified by the evidence. We think that the two end sections may be adequately repaired without large expense; that it is not necessary that said end sections be covered with the proposed jacket. Therefore, we conclude that the cost found by the court to be necessary for the proper repair of the spillway is excessive. We think that an expenditure of $9,000 will be sufficient to cover the middle section with the proposed jacket, and otherwise repair the two end sections; also, that such repairs will remedy and fully compensate for any claimed change of radius. The amount allowed for repair of the spillway is reduced to $9,000.

IX.   Under a separate contract, appellant built a dike wall, extending about 65 feet from the west abutment of the dam, northwest to the river bank. This wall was destroyed by the flood which occurred in March, 1920. In their counterclaim, defendants demand damages on account of reconstruction of said dike wall, in the amount of $18,973.91, claiming that said amount was the cost incurred in reconstructing said wall. Passing on this claim, the court below found:

"That the northwest dike wall was a separate project, was built before the disaster, substantially in accordance with the contract; and I am of the opinion that the loss thereof falls upon the defendant."

Appellees' appeal is from the decree of the court refusing recovery upon such claim. We think that the court did not err in refusing to allow such claim. We have carefully examined the evidence, including the photographic exhibits, bearing upon this issue. The wall was not built down to bed rock. The contract for construction did not so provide. Defendants insist that a fill was not made back of the wall, and that the water at

the time of the flood washed into a ditch or space left where the diversion wall joined onto the abutment, and thus, through the negligence of plaintiffs, caused the wall to be undermined and swept away. This contention is not borne out by the evidence. On the other hand, the record clearly shows, by the testimony of eyewitnesses, that the first break did not occur where the diversion wall joined onto the abutment, but some distance away. We think it conclusively appears from the evidence, and especially from the photographic exhibits, that no trench or space was left along the wall, as claimed by appellees, but that back filling had been properly made against the wall. We think it also conclusively appears from the evidence that the undermining of the wall was caused by the water's seeping through the soil, which was somewhat sandy, and coming up under the wall. There must be an affirmance on defendants' appeal.

Summarizing, our conclusions are: Appellant should be charged as follows:

| | |
|---|---:|
| Amount paid on contract price, | $26,285.72 |
| Lien of Lumber & Grain Co., Intervener | 2,487.13 |
| Cost of reconstructing west abutment | 3,320.00 |
| Cost of repairing power house | 3,000.00 |
| Cost of repairing dam | 9,000.00 |
| | $44,092.85 |

| Credits | | |
|---|---:|---:|
| Original contract price | $30,000.00 | |
| Allowed for extras | 3,039.00 | |
| Total | $33,039.00 | $33,039.00 |

| | |
|---|---:|
| Balance due appellees | $11,053.85 |

The judgment of the court below is modified as above indicated, and, as so modified, is affirmed.

Results in judgment in favor of appellees and against appellant in the amount of $11,053.85. Case is affirmed on defendants' appeal.—*Modified and affirmed on plaintiff's appeal; affirmed on defendants' appeal.*

Preston, C. J., Evans and Stevens, JJ., concur.