# R. LEE TOLLEY COMPANY v̇. WALTER L. MARR et al.

Eastern Section. ——— —, ——.

Whitaker & Whitaker, of Chattanooga, for R. Lee Tolley Co.
Allison, Lynch & Phillips, of Chattanooga, for Walter L. Marr.

PORTRUM, J.  The R. Lee Tolley Company was employed by Walter L. Marr to construct a house for him on Signal Mountain, near Chattanooga, Tennessee.  Some time before the house was completed, Marr discharged the Tolley Company; thereupon the Tolley Company brought suit for damages.  The defendant Marr filed an answer and a cross-bill, claiming that he had a right to discharge Tolley; denying the Tolley Company's right to recover on account of various defects in construction, and charging that it had cost him greatly in excess of the contract price to have the house completed by other parties, and praying for judgment against the Tolley Company and its surety on its bond for the excess.

The chancellor decreed that the contracting company had been wrongfully discharged, and dismissed Marr's answer and cross-bill. He held, however, that the brick work on the house had not been constructed in accordance with the contract and decreed that there should be deducted from Tolley's contemplated profit, if any, the cost of tearing down the brick work to the water table and rebuilding.  From this portion of the chancellor's decree, Tolley Company appealed, and from that portion holding that the Tolley Company had been wrongfully discharged, the defendant Marr appealed.

The question of the breach of the contract and who breached it turns upon a construction of the provision of the contract.  The contract is composed of several documents, namely the agreement (made out on a form prepared and recommended by the American Institute of Architects) ; general conditions, being a printed document of many articles prepared by the Institute of Architects; the plans, consisting of eleven sheets of drawings, prepared by J. B. Alsup, the architect; and the specifications consisting of fourteen pages of typewriting prepared by the architect.

The portions of the contract deemed pertinent to the inquiry are set out:

"Art. 38.  The architect shall have general supervision and direction of the work. He is the agent of the owner only to the extent provided in the contract documents and when in special instances he is authorized by the owner so to act, and in such instances he shall, upon request, show the contractor written authority.  He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract.

"As the architect is, in the first instance, the interpreter of the conditions of the contract and the judge of its performance, he shall side neither with the owner nor with the contractor, but shall use his powers under the contract to enforce its faithful performance by both.

"In case of the termination of the employment of the architect, the owner shall appoint a capable and reputable architect, whose status under the contract shall be that of the former architect.

"Art. 39. The architect shall, within a reasonable time, make decisions on all claims of the owner or contractor and on all other matters relating to the execution and progress of the work or the interpretation of the contract documents.

"Except as above or as otherwise expressly provided in the contract documents, all the architect's decisions are subject to arbitration.

"Art. 40. ARBITRATION. All questions subject to arbitration under this contract shall be submitted to arbitration at the choice of either party to the dispute.

"The demand for arbitration shall be filed in writing with the architect, in the case of an appeal from his decision, within ten days of its receipt and in any other case within a reasonable time after cause thereof and in no case later than the time of final payment, except as otherwise expressly stipulated in the contract. If the architect fails to make a decision within a reasonable time, an appeal to arbitration may be taken as if his decision had been rendered against the party appealing.

"Unless otherwise provided by controlling statutes, the parties may agree upon one arbitrator; otherwise, there shall be three . . .

"If there be one arbitrator his decision shall be binding. Such decision shall be a condition precedent to any right of legal action, and wherever permitted by law it may be filed in court to carry it into effect.

"The award of the arbitrators shall be in writing and it shall not be open to objection on account of the form of the proceeding or the award, unless otherwise provided by the controlling statutes.

"In the event of such statutes providing on any matter covered by this article otherwise than as hereinbefore specified, the method of procedure throughout and the legal effect of the award shall be wholly in accordance with the said statutes, it being intended hereby to lay down a principle of action to be followed, leaving its local application to be adapted to the legal requirements of the jurisdiction having authority over the arbitration.

"ART. 22. OWNER'S RIGHT TO TERMINATE CONTRACT. —If the contractor should be adjudged a bankrupt, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed on account of his insolvency, or if he should persistently or repeatedly refuse or should fail, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper materials, or if he should fail to make prompt payment to subcontractors or for material or labor, or persistently disregard laws, ordinances or the instructions of the architect, or otherwise be guilty of a substantial violation of any provision of the contract, then the owner, upon the certificate of the architect that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy and after giving the contractor

seven days' written notice, terminate the employment of the contractor and take possession of the premises and of all materials, tools and appliances thereon and finish the work by whatever method he may deem expedient. In such case the contractor shall not be entitled to receive any further payment until the work is finished. If the unpaid balance of the contract price shall exceed the expense of finishing the work including compensation for additional managerial and administrative services, such excess shall be paid to the contractor. If such expense shall exceed such unpaid balance, the contractor shall pay the difference to the owner. The expense incurred through the contractor's default, shall be certified by the architect.

"Art. 15. CHANGES IN THE WORK:—The owner, without invalidating the contract, may order extra work or make changes by altering, adding or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

"In giving instructions, the architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the owner signed or countersigned by the architect, or a written order from the architect stating that the owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered."

The only reasons for discharging the contractor are stated in the correspondence with the contractor, consisting of a letter to the contractor enclosing two copies which will follow the letter:

"Mr. R. Lee Tolley, Chattanooga, Tennessee.

"Dear Sir: As you know, I have discontinued the services of Mr. J. B. Alsup, as architect on the building, which you have been constructing for me on Signal Mountain. I hereby enclose a copy of my notice to him which explains itself. I have employed Mr. Charles Bearden to complete this work as architect, and I herewith enclose copy of his letter to me with reference to same.

"For the reasons set out in my letter to Mr. Alsup, and for the reasons I have explained to you, I do not feel that the work has been done, or will be done, according to the contract, and for that reason I hereby serve notice on you to discontinue the work, and I will take it over and complete it according to the contract.

"I do not desire to entail any loss on you on account of this work, or our misunderstanding about it. I understand that you have made sub-contracts with reference to the work and material and I desire to assume, wherever it is possible, your obligations with reference to

these subcontracts. I, therefore, request that you submit the bids to Mr. Bearden who is authorized to assume same for me where the same can be done consistently with the proper execution of the work under the contract. This does not exclude your contract from the brick work, which has not been done according to the contract. Very truly yours (signed) W. L. Marr.''

First enclosure:

''Mr. J. B. Alsup, Chattanooga, Tennessee. Dear Sir: I hereby notify you to discontinue your services as architect in the construction of my residence on Signal Mountain, Tennessee. I regret the necessity of taking this step, but for my own protection I must dispense with your services as such architect for the following reasons:—

''1. For your failure to give the necessary attention to the work while it progresses.

''2. Because you have permitted the contractor to use defective material and construct the work in a defective and unworkmanlike manner, all of which I have complained to you about, and the details of which are well known to you.

''3. You have permitted the contractor, over my protest and over the protest of the authorities of the town of Signal Mountain, to construct a material part of the work in violation of the ordinance of said town of Signal Mountain.

''4. You have permitted the contractor to disregard the plans and specifications in the manner heretofore frequently pointed out to you, in personal conversation. Yours very truly.''

Second enclosure:

''Mr. W. L. Marr, Signal Mountain, Tennessee. Dear Sir: I have examined your building on Signal Mountain now in the course of construction, with reference to accepting employment as architect.

''I find that the constructions of the flues have been started without complying with the ordinance of the Town of Signal Mountain, requiring that they should be lined. This will have to be remedied so as to comply with the ordinance.

''I find that some of the brick walls have been constructed without being laid to a line and without being plumb. If you desire these walls laid to a line and plumb, they will have to be taken down and rebuilt. I find that some of the walls have not been properly tied in and banded, as they should have been, and this will have to be corrected.

''I am informed that Mr. Alsup has condemned some of the brick walls and ordered them taken down, and that it has not been done.

''I will later give you more in detail the things necessary to be done in order to correct the imperfections herein pointed out. Very truly yours,''

The contractor insists that the reasons stated in the correspondence are not good and sufficient reasons justifying the termination of the

contract by the owner; because, first, the complaints were not well founded, and, second, the owner did not follow the provisions involved in the contract and procure a certificate from the architect as a condition precedent to a forfeiture of the contract for cause. It is insisted that if any of these complaints were justifiable the contract provided a method for their correction and this method was ignored and repudiated by the owner.

The architect was selected and employed by the owner, and made the interpreter of the provisions of the contract and the manner of its execution, as well as the arbitrator of disputes arising between the contractor and the owner; or the arbitrator of disputes arising between himself and the contractor or owner. His decision was final unless an appeal was made to a board of arbitration by the unsuccessful party. This was the only remedy afforded the contractor but the owner had an additional remedy for he could discharge the arbitrator or architect and employ another. This method was not open to overturn a decision once made by the arbitrator, but it was a source of protection against an incompetent and inefficient architect which was not afforded the contractor.

In the dispute, referred to in the foregoing correspondence, the architect sided with the contractor and the owner did not submit the decision to a board of arbitration as provided in the contract, but, on the other hand, expressly declined to be bound by this provision of the contract. The failure to follow the provisions of the contract and appeal to arbitration, to correct the complaints, was not an oversight on his part, but was an express repudiation, how will he be permitted to repudiate the provisions of the contract?

We should have said that one of the principal complaints was to the brick work and upon this complaint the architect sided with the owner and condemned the brickwork; so, under the provisions of the contract, it was the duty of the contractor to remove and reconstruct this part of the work. There was a dispute as to just what portions of the brick work was condemned and ordered removed. This question of fact will be dealt with hereafter.

The chancellor said:

"In other words, in the absence of a certificate by the architect or collusion or fraud on his part, inquiry into the sufficiency of grounds for discharge is precluded. As long as the architect is faithful, he is by the terms of the contract the judge of its performance. Collusion or fraud can, of course, be shown by direct proof or by circumstances, and a breach of the contract by the contractor may be so glaring that the failure or refusal of the architect to act would raise the presumption of fraud. It was insisted upon the trial, but was not alleged in the cross-bill, that Alsup was in collusion with Tolley to rob the defendant. The foregoing considerations make it proper in this case to state briefly the facts about the matter complained in the cross-bill."

The chancellor then takes up each specific charge made in the cross-bill and finds that they are without sufficient merit to justify the owner in putting an end to the contract. Before reviewing the most important of these charges, we will refer to the position of the owner with reference to his pleading. While it is not plead in general or specific terms, it is necessary to state the facts which raise the questions of fraud and it is not sufficient to plead fraud in general terms. In the absence of pleading, the question of fraud or collusion is not before this court. Counsel for the owner say that the question of fraud and collusion is immaterial. Their position is this: if the building was not constructed, or could not be constructed, according to the terms and specifications of the contract, then it was not necessary to have the certificate of the architect before discharging the contractor, nor his decision upon matters which were clearly in violation of the written terms of the contract. In other words, the architect, under the guise of his powers as arbitrator, could not make a new contract between the owner and the contractor. This proposition, it seems to us, is borne out by the express terms of the contract, at least the contract provides that the architect's decision must be according to the terms of the contract.

"The architect's decision in matters relating to artistic effect, shall be final, if within the terms of the contract documents."

But if the contract be silent upon this question, the rules of construction of written contracts do not permit alteration in expressed provisions without an express provision within the contract permitting it. The owner's position is supported by the case of Marsh & Company v. Light & Power Company, 196 Iowa, 926, where it is said:

"Dobson, the designing and superintending engineer, could not bind appellees by approving and accepting the plant constructed of materially different and inferior materials and workmanship from that required by the contract. Glacius v. Black, 50 N. Y., 145 (10 Am. Rep. 449). Dobson, engineer had authority to hear disputes between the contractor and the owners, or the inspector of the work employed by the owners, that might arise in the progress of the work, as to whether or not materials called for by the specifications were being used, and whether or not the workmanship was of the quality called for by the contract. But said engineer had no authority to change the plans and specifications and approve and accept interior materials and workmanship. Foeller v. Heintz, 137 Wis. (24 L. R. A. (N. S.), 327); Madern Steel Structural Co. v. Van Buren County, 126 Iowa, 606; Van Buren County v. American Surety Co., 137 Iowa, 490. The plans and specifications were the basis of the contract, and the engineer, Dobson, could not change the same by permitting the use of concrete composed of materials different from and not the equivalent of the 1-2-4 mixture specified, without the express consent of appellees, the owners. Foeller v. Heintz, supra. Dobson's author-

ity, as supervising engineer was limited. He had no authority to sanction and approve the use of materials or workmanship otherwise than as provided in the plans and specifications, except as he might be given authority to do so by the contract. No such authority was given in the contract. Verbal agreements as to changes are without effect. Volquadsen v. Davenport, H. & S. Sav. Bank, 161 Iowa, 706; Benson & Marxer v. Brown, 190 Iowa, 848.'' See Walstrom v. Oliver Watts Construction Co., 161 Ala., 608; and Lewis v. Yagel, 28 N. Y. S. 833.

We think if the decisions of the architect amounted to a material change of the contract that the question is open to review without pleadings charging fraud or collusion. This should be qualified by the further statement that before the owner could terminate the contract the architect's decision must have been made on behalf of the contractor; if the decision was made to correct an error of the architect and not for the benefit of the contractor, then the contractor should not be held responsible for the architect's error. It is necessary for us to review the complaint to determine if the contract has been violated and, if so, was the violation on the part of the architect or the contractor?

We know of no ruling of law which would hold the contractor responsible for errors made by the architect or for decisions and defective plans which render it impossible to construct the building according to the specifications. If the owner selects a negligent and inefficient architect, he has no grounds to complain because the contractor cannot construct the building according to the plans and has to deviate from them, upon order of the architect, in order to correct the mistakes of the architect. So long as the contractor gains no undue advantage, or unjust advantage, because of the architect's mistakes, then he is not responsible to the owner for the confusion and alteration made necessary because of the gross mistakes of the architect.

To restate the position of the owner, (1), he insists that the provision in reference to arbitration is void because it denudes the courts of jurisdiction; (2), the letter of the second architect, above quoted, is a sufficient certificate justifying the discharge of the contractor; (3), the contractor had proceeded to a point where he was disabled from completing the building according to the plans and specifications and this justified his discharge at the time.

The provisions for arbitration are not void because it denudes the court of jurisdiction, for the reason it is especially provided the award shall be a condition precedent to a proceeding, Cole Manufacturing Co. v. Collier, 91 Tenn., 381, 119 S. W., 672; the contract also limits the arbitration provisions to conform with the state law codified in Section 5188, Shannon's Code.

The letter of the second architect, Bearden, is not a certificate justifying a discharge. It has heretofore been set out in full. Its purpose is expressed in the first paragraph, to-wit:

"I have examined your building on Signal Mountain, now in course of construction, with reference to accepting employment as architect."

After detailing certain defects he concludes:

"I will later give you more in detail the things necessary to be done in order to correct the imperfections herein pointed out."

He thereafter gave directions for the corrections, we assume, under the provisions of the contract by giving a certificate justifying the change or ordering the work torn out or rebuilt. We think it would be unreasonable to construe this letter as a certificate justifying the discharge of the contractor. It certainly was not intended as such.

Were the specifications changed, at the instance of the contractor, and would the contractor by his actions disable himself from completing the building according to the contract? We will deal only with the principal grounds of complaint, for the others are unreasonable and have been adequately disposed of by the chancellor in his opinion. The most serious is stated by the chancellor in the following words:

"The plans show that the first floor of the main part of the house was to be eighteen inches high and the floor of the living room and approximately two feet four inches above the drain of the lot. The top of the water table around the house was to be on a level with the top of the living room floor. In front of the living room was to be a terrace, covered with a cement slab, with a border of stone. The terrace was to be about six inches lower than the living room floor. The living room floor was to be constructed of tile and reinforced concrete joists four inches thick, on top of which was to be a reinforced concrete slab six inches thick, and on top of this there was laid a finish of terrazzo, one and one-half inches thick. This was the relation of the floors and the water table and the terrace to each other. Entering the living room from the terrace, one would have to step up at the door.

"When the floor was being laid out, Alsup fixed the level of the main floor at about two feet above the grade and marked the level of the main floor by causing a nail to be driven in a near-by stump and the level of the top of the living room floor by a nail driven in a near-by tree. Tolley built the foundation walls accordingly, but when he did this it was found that the water table, which rests on the foundation walls, would be beneath the ground in front. When he called Alsup's attention to this fact, the latter directed him to raise the level of the water table six inches. The tile and joints and concrete slab of the living room floor were al-

ready laid, but the Terrazzo finish had not been laid, and was not laid by Tolley when he was discharged. Raising the water table six inches caused this to be above the level of the floor.

"George Becking characterizes this as a gross blunder, and the result intolerable to a building of this character. Certainly it was not in accordance with the plans. It was a blundering of the plans to correct an error. Marr was present when the nails were driven, and he made no complaint until after he discharged Tolley; on this account, it is suggested that he is estopped. I do not think so. Mechanician though he is, he is not an architect and he could not and did not foresee the consequence of fixing the levels of the floors as they were fixed.

"But the question is whether this mistake justifies the discharge of the complainant. I think not. It was Alsup's mistake. Tolley did as directed by him.

"When Becking & Son took over the job, they made the living room floor harmonize with the rest of the work by laying another concrete slab on top of the one laid by Tolley, which made it necessary for them to put concrete columns underneath in the cellar to support the added weight."

The contractor could have followed these levels and constructed the house in accordance with the specifications and the contract. The architect made a serious mistake, because the front of the house according to the plans was below the surface and this may have marred it irreparably. After the work had proceeded, as detailed by the chancellor, the mistake was discovered by the contractor and called to the attention of the architect; it was corrected as above detailed. The owner does not complain because the house was not constructed in a hole. The complaint is that the contractor is responsible for the erroneous level mark. We do not think it necessary to argue this question, as it is apparent that the contractor was guilty of no misconduct or deviation from the plans on his own accord. It cannot be disputed but that it was to the interest of the owner that the level be changed so that the building would conform to the ground level. If any one was responsible for this blunder, and it seems that some one was, then the architect was, and the owner should look to him and not the contractor for compensation. This did not justify the discharge of the contractor.

The owner again complains because the building was not constructed according to the plans in the following particulars:

One of the bathrooms called for a concrete floor of a certain thickness. It was discovered that the necessary pipes for making the water connections were not covered and the floor would necessarily have to be increased in thickness; that was ordered by the architect. For this extra concrete the contractor would have been entitled to compensation as an extra.

The second floor and attic called for a certain concrete mixture of a certain weight, i. e., 60 and 50 pounds. To carry this weight, the concrete supports should have been a certain specified dimension, but the specifications called for a dimension that would not support this weight but would support a floor calling for 50 and 40 pounds tension. Here was an error on the part of the architect and the floor had to be decreased in tension or the support increased. The architect ordered the carrying weight reduced to conform to 50 and 40 pounds, making it unnecessary to increase the supports, for which, we think, the contractor would have been entitled to compensation as an extra. But the architect held that since the deduction in the carrying weight from 60 to 50 to 50 to 40 reduced the amount of concrete called for in the floors then this reduction compensated the contractor for putting down the concrete in the bathroom. Under this interpretation by the architect, the contractor suffered to the extent of the additional cost required in laying the bathroom floors. The owner says this conduct is a material alteration of the plans of the building. Here were two mistakes, made by the architect, which had to be corrected. As we have said, the contractor is not responsible for the architect's errors.

In reference to the brick work the chancellor said:

"Tolley contracted with J. P. Norris, a brick contractor, to furnish the materials and to do the brick and tile work for a stipulated sum. . . . At the time Tolley was discharged the walls of the first floor were up in parts nearly to the second story, and the other parts only four or five feet high. No two of the witnesses agree in their statements as to just how high they were. Reynolds says that on the whole about two thirds of the walls of the first floor had been laid. They were up far enough to disclose various defects in workmanship. All of this and the water table were torn out by Becking & Son.

"In the first place, there was a basement door and over the windows rowlocks were resorted to and split bricks were used under the windows. Some of the witnesses who assumed to approve this work say that these things do not constitute defects. Manifestly they do. They show to any one looking at the building at all critically a job that was either badly designed or badly executed. Given the thickness of the brick and of the mortar joints, then if the window sills are not fitted at the proper height and the work properly done, the course of brick will come exactly to the window sill and there will be no occasion for using split brick. The same is true about the use of rowlocks at the top of the windows if the necessity for them was due to the location of the windows, that fact must have appeared the minute the store poles were set on the

corners, and the matters should have been taken up and corrected then and there. The building was completed by Becking & Son and shows no split brick or rowlocks in these places. The plans do not call for them, and I do not blame defendant for being dissatisfied with them.

"Speaking generally, the brick work was not plumb on line. This is the preponderance of the evidence in the case on this subject. It was not tied as thoroughly as required by the contract. At one place, there was a bulge in the wall, which Tolley admits·he undertook to correct by driving the brick back into the wall after they had been laid fifteen hours, and other courses of brick laid on top of the bulge. The doors in the rather narrow vestibule were set about two inches off center, so that the wall or column on one side of the door showed a width of one brick while on the other side a brick and a part of a brick showed. This was due to the fact that the steel frame of the door, when it arrived, was found to be wider than the wooden frame to which the brick had been laid up, and to make room for it, resort was had to the expedience of cutting off the brick work on one side, instead of taking the whole thing down and relaying the brick properly. A number of brick scattered throughout the walls were laid wrong edge out, showing an irregular edge on the outside of the wall. There were not many of these, to be sure, but the fact that there were any at all indicates slipshod workmanship.

"There is not, as I recall the evidence, a witness in the cause who without qualification says that this was first class job of brick work. . . .

"Alsup says that he condemned the walls and ordered Tolley to tear them out down to the window sills. He says that he was discharged the day after he gave this order and thereupon he advised Tolley to do nothing about it until a new architect came upon the job. In this statement, Tolley disagrees with Alsup. He says emphatically that he received no order to take the walls down to the window sills. Lane and Reynolds, his employees, and Norris, the contractor, say that they did not hear of such an order. They all say that the orders to tear out which Alsup gave related to the brick for a distance of several feet each way from the northwest corner which admittedly showed bad work. This they say they were tearing out at the time Tolley was discharged, but that the rest of the wall was being continued and had then not been torn down to the window sills. I do not think the evidence is sufficient to show that Tolley was proceeding with purposeful defiance of any order Alsup had given to this end in regard to the brick work, as understood by him. He would hardly have dared to pursue such a course at that juncture, if he had been inclined

to do so, because there was a crisis in their affairs and at that time Tolley well understood that his position was precarious.

"The brick work, then, was bad. But the question is, Did this fact justify the defendant in discharging Tolley without an architect's certificate? I think not. On the contrary he had a remedy for this bad work, namely, to have it torn out, at Tolley's expense and properly rebuilt. After Alsup's discharge, defendant employed a new architect, Mr. Bearden, but Bearden did not advise him that he would be justified in discharging Tolley. He only said that some of the walls were not plumb and level and would have to come down, without specifying what walls, and referred to his understanding that Alsup had condemned some of brick work."

If the contractor disobeyed the orders of the architect, and continued to do work after it had been condemned, this is not a reason assigned by the owner for the discharge of his contractor. We do not think the proof warrants the holding that the contractor, in disobedience of an order to tear the walls down, continued to build upon them. He, in fact, tore down the work in part, and undoubtedly would have followed the directions of the architect if required to tear down the work to the window sills. We think if this character of work had met the approval of the architect and he had sided in favor of the contractor, then this would have amounted to a modification of the plans and specifications, for they called for work done in a workmanlike manner. But the architect testified that he ordered the walls torn out to the window sills, and the contractor admits that he had ordered parts of the walls torn away; it is not insisted that the whole of the wall was defective, so there was an attempt to correct the bad workmanship. We are not in a position to say that the attempt would not have been successful. The contract expressly provided that in case of defective workmanship it should, at the order of the architect, be torn away, and reconstructed at the contractor's expense. Bad workmanship alone does not justify a discharge of the contractor. It is only after the architect has sided with the contractor and approved work that is defective and not in compliance with the contract, that the owner is justified in discharging the contractor, and refusing to pay the contract price. Before the owner can disregard the provisions of his contract and assert its breach upon the ground of defective work, he must show the architect sided in favor of defective work and the change in the plans. This is not the case before us.

The chancellor found that the owner was entitled to set off the costs of the construction of the brick walls against the profits, if any, that the contractor was entitled to recover upon the contract. The contractor assigns error to the action of the chancellor in permitting this deduction in profits. He insists that the brick work was not condemned down to the window sills; the architect, Alsup,

says he condemned it down to the window sills; after the discharge of Alsup and the employment of another architect, this latter architect condemned the work, so if the contractor had been permitted to continue the work and finish the contract he in any event would have been required to take down a great deal of the brick work. The brick work should have been condemned because of the inferior workmanship, it did not conform to the specifications, and had it not been condemned and the job completed, the contractor could not save himself, for he would have breached the provisions of the contract. The condemnation of the work saved the contractor from a breach of the contract because under its conditions he had the right to reconstruct defective work, upon the order of the architect, without a breach of his contract. Under no event should the contractor be paid for this brick work, and we find no error in the action of the chancellor in denying him compensation for it.

We have another assignment of error made by the owner to be disposed of. It is said the chancellor erred in ordering a reference to ascertain the profit, if any, the contractor would have earned had he been permitted to finish his contract, less the cost of the replaced brick work. It is shown that the owner spent more than the contract price in completing the building according to the specifications and requirements of the contract. The amount of the cost is not disputed and it is said there was no necessity for a reference. In support of this position, the following cases are cited: Mills, etc. v. 2nd Ave. Railway Co., 102 N. Y., 572, 7 N. E., 905, 55 Am. Rep., page 39; Clark v. Fleischmann Vehicle Company, 187 N. Y. S., 807; Bates v. Construction Co., 255 Pa. 200.

Had the contractor breached the contract, then the position of the owner would have been tenable and supported by the authorities above cited. In that case the contractor could not have questioned the amount expended by the owner in completing the contractor's undertaking. The owner could say to the contractor that if he spent too much in completing the contract, the contractor cannot complain because he could have prevented it by performing his own contract. But in the instant case the owner breached the contract and disabled the contractor from completing it. The owner cannot defeat the contractor's profit by saying that he expended more in completing it than the contractor contracted to complete it for. The contractor may have been able to do the work cheaper than the owner. If this were not the rule, the owner could breach the contract at any time and evade damages, by showing that he expended more than the contract price in completing the building.

We find no error in the judgment of the lower court, and the case is affirmed and remanded for the reference ordered by the chancellor. The costs of the appeal will be taxed against the parties equally.

Snodgrass and Thompson, JJ., concur.